## LYNCH & MALLORY *vs.* STONE and others.

If the canal commissioners divert the waters of a stream, for the temporary supply
· of a canal, without first resuming the use of all surplus waters which have been
leased on that level, pursuant to *Stat.* 1833, *p.* 261, § 1, they are liable to an ac-
tion at the suit of the owner of the waters so diverted. *Semble. Per* BRONSON, C. J.
But water running from a higher to a lower level of a canal, the use of which, in its
passage, has been leased by the state to individuals, is not *surplus water* within
the intention of the statute, and the use of it need not be resumed to enable the
commissioners to enter upon and take other waters for the temporary supply of
the higher level.
A canal commissioner may justify taking the waters of a stream for the temporary
use of the canals, though he declared when the diversion was made that the water
taken belonged to the state, and that he did not act under the statute authorizing
the taking of water for a temporary supply.

ACTION on the case for diverting the waters of the Mohawk
river from the plaintiffs' mill at Rome, tried at the Oneida cir-
cuit, in April, 1844, before GRIDLEY, Cir. Judge. The water
was diverted from the mill, and turned through the feeder of
the Erie canal, at different times in the months of July, Au-
gust and September, in the year 1843. Benjamin Enos, one
of the defendants, was then acting canal commissioner on that
section of the Erie canal, and the other defendants acted under
his directions in turning the water. It was admitted that the
water was diverted from the mill for the use of the Erie canal,
and for that purpose only. The plaintiffs proved that the
canal commissioners, in 1830, leased the surplus water of the
canal at Utica, near the east end of the Rome level, to Maria
Miller. Also, that in 1826 they leased the surplus water of the
canal at the first lock, at the west end of the Rome level, to
Oliver Teall; and the same year they leased the surplus water
on the Salina and Syracuse level, to be drawn from the Salina
basin, to Aaron Burt. The plaintiffs also gave evidence that
mills had been built, and the waters of the canal were used by
Teall and Burt, in the summer and fall of 1843. It appeared
that the water leased to Mrs. Miller at Utica, had been re-

s amed by the commissioners prior to the time in question. The water was drawn around the first lock at the west end of the Rome level, used in Teall's mill, and then passed again into the canal. At Salina, the water was used for Burt's mill, the weigh lock, state pump, and the Oswego canal. It did not appear that any water was taken by either of the lessees which was not again returned to one of the state canals.

The plaintiffs offered to prove that when the water was diverted, Enos, the canal commissioner, did not claim to act under the statute authorizing an appropriation of water for temporary use, and directing an appraisal therefor; but disclaimed so to act; and claimed the right to divert the water on the ground that it belonged to the state, and he had a right to take it without compensation. The judge rejected the evidence. The judge held, that there was no surplus water on the Rome level which could be resumed; that the waters at the west end of that level, which were used by the mills and then turned again into the canals, and were necessary for feeding the canals west of that level, were not such surplus waters as the commissioners were bound to resume before taking other waters for the temporary use of the canal; and that those whose waters had been taken, should apply to the appraisers for damages. The plaintiffs were nonsuited. They move for a new trial on a bill of exceptions.

*C. P. Kirkland,* for the plaintiffs, cited 23 *Wend.* 615; 3 *Hill,* 216; 6 *Hill,* 536; 9 *Wend.* 147; 2 *Camp.* 344; 3 *Pick.* 38; 4 *Wend.* 639; 9 *Cowen,* 274; 10 *Adol. & El.* 90; 6 *Wend.* 426.

*J. Van Buren,* (attorney general,) for the defendants.

*By the Court,* BRONSON, Ch. J. When the navigation of any canal is interrupted or endangered by reason of a deficiency of water, it is the duty of the canal commissioners to supply the deficiency without delay; and for that purpose they are, in the first place, to resume the temporary use of all the surplus

waters which have been leased on the level of the canal where the deficiency exists; and if there still be a deficiency, the commissioners then have power to enter upon and use all lands, streams and waters which in their judgment may be necessary or proper to procure a temporary supply of water for the canal. And when lands, streams or waters have been taken for temporary purposes, the owner may obtain his damages in the mode prescribed by law. (*Stat.* 1833, *p.* 261, §§ 1, 2; 1 *R. S.* 227, §§ 58, 59; *Stat.* 1836, *p.* 407, §§ 10, 11.) The water in question was taken for the temporary use of the Erie canal; and if the plaintiffs could not agree with the agents of the state as to the amount of their damages, they might have had the damages appraised and paid in the manner which the statute directs. That was the only remedy. Neither the canal commissioner nor the other agents and servants of the state who have been sued, are liable to this, or any other action, unless they have failed to discharge their duty in a proper manner.

The principal ground on which the plaintiffs sought to recover was, that the canal commissioners had not resumed the temporary use of all the surplus waters which had been leased on the Rome level of the canal, before the water was diverted from the plaintiffs' mill. The proof clearly established that the water which had been leased to Mrs. Miller, near the east end of the level, had been resumed by the agents of the state. The only question is, as to the west end of the level; and there the principal inquiry is, what are "surplus waters" within the meaning of this statute. Teall's mill is turned by the water which passes around the first lock at the west end of the level, and falls again into the canal to supply the levels west of that point. At Syracuse these waters, with those which come from the west, commence feeding the Oswego canal; and at Salina, they work the state pumps and turn Burt's mill; and then, as may be inferred from the case, fall again into the Oswego canal. But whether that inference be well founded or not, there is no evidence that a single drop of water is wasted from the public works of the state; or that any more water is used for those works than would be necessary if the mills in question had

Lynch *v.* Stone.

never been erected. It often happens that it is necessary to draw more water, either through or around a lock, for the supply of the level or levels below, than would pass by the mere locking of boats; and if that water turn a mill while passing from the upper to the lower level, it is not surplus water within the meaning of this statute. It is surplus water in reference to the particular lock around which it is conducted; but not so as to the canal in general; for as to that it is only a necessary supply. It is water which may be leased to, and used by another during the brief period while it is passing; but as it returns again into the canal, it never ceases to be a part of the public works. The legislature could not have intended that such waters should be resumed under this statute, because the resumption would not help to supply the deficiency, or afford the least aid in keeping up the navigation. The waters to be resumed were evidently such as ran to waste, so far as the canals were concerned, after they had been used by the lessee. Such was the case with the waters drawn from the canal for the mill at Utica: but those waters were resumed.

If the case be not the same at Burt's mill that it is at Teall's, it lay upon the plaintiffs to show the fact. Until it appears that the waters which turn Burt's mill afterwards run to waste, without falling again into the public works, it is impossible to say that they are surplus waters to be resumed, within the meaning of this statute.

After the plaintiffs had got through with the case in relation to the waters which had been leased, they offered evidence of what the commissioner said at the time the water was diverted; and it is insisted that had the evidence been received, it would have created an estoppel *in pais*, on which the plaintiffs could have recovered. Whatever the commissioner may have said at the time, it is quite clear that the water was taken for the use of the Erie canal, and for no other purpose. Indeed, that fact was admitted on the trial. And it was taken for the temporary—not the permanent—use of the canal. It was diverted for only a few days at a time, and on several occasions, within the months of July, August and September, 1843; and there is no

complaint of any other diversion. It is evident, therefore, that the declaration of the commissioner, which the plaintiffs proposed to prove, was not a denial that the water was taken for the temporary use of the canal; but a denial of the plaintiffs' right to an appraisal of damages under the statute, because the water belonged to the state, and he had a right to take it without compensation. This is all that I can make out of the offer. Now, what the commissioner might have said about the ownership of the water could not be a matter of the least consequence on this trial. If the plaintiffs did not in fact own the water, they were entitled to nothing, either as against the state or the defendants. If they owned the water, then it is clear that they were entitled to be paid their damages under the statute; and no declaration which the commissioner had made on the subject could possibly affect the right, either one way or the other. Saying that the state owned the property would not make the commissioner a wrongdoer. He had a right to take the water, whoever owned it. The claim for damages was a thing to be settled afterwards.

New trial denied.