CLINTON GENERAL TERM, July, 1850.   *Paige, Willard,*
*Hand, and Cady,* Justices.

HARRIS and others *vs.* THOMPSON and others.

In the year 1820 the state built a dam across the Hudson river at Fort Miller,
which was about four feet higher than an old dam then existing at that
place.   The object of the new dam was to make slackwater navigation con-
necting the Champlain canal at Fort Edward with the canal at Fort Miller.
At the time of the erection of such dam there were mills on both sides of
the river, owned by the occupants of the lots on each side respectively, and
in 1832 and 1834 the plaintiffs and their grantors erected new mills on the
west side of the river.   In 1828 the canal from Fort Edward to Fort Miller
was finished, which rendered the slackwater nearly useless.   In 1829 an
act was passed by the legislature, for the payment of damages sustained by
the erection and continuance of the dam; and if the interest on the amount
paid was more than the amount received for the use of the surplus waters,
the canal commissioners were to lower the same, so that further damages
would not be sustained, and the land was to continue the property of the
owners.   The same year one of the foremen of the canal took part of the
planks off the dam, which were partially restored by a tenant of the mills,
and again displaced.   In 1830 an act was passed requiring the canal com-
missioners to replace the timbers of the dam, and the canal appraisers to
estimate all the damages arising to the several owners or occupants of land
affected by the erection and continuance of the dam, but the lands on which
the damages were sustained were to continue to be the property of the sev-
eral owners.   And in case the persons interested in the continuance of such
dam should pay into the state treasury a sum of money which, after de-
ducting therefrom the sum of $1500, the estimated amount of benefit to
the state, should equal the amount of such damages, then the dam was to
remain; otherwise the canal commissioners were to remove it.   Under this
act the damages were appraised at $2575,60, of which sum $1074,99 was
thereupon paid by the Messrs. B., owners of mills on the east side of the
river; and the dam was then repaired by the state, under the said law.   At
the time the state dam was built, it was agreed between the canal commis-
sioners and B. & H. the plaintiffs, who were occupants of the mills on the
west side of the river, that if the latter would build 100 feet of the dam the
former would let them have the additional head.   They built the 100 feet ac-
cordingly, and used the surplus water from that time until 1836 when the de-
fendants tore away a part of the dam, thereby stopping the plaintiffs' mills.
In an action on the case by the plaintiffs, to recover damages of the defend-
ants for the injury thus occasioned,

*Held,* 1. That the state had the power to keep up the dam, without regard to
consequences; and that so far as the dam had been kept up by the state,

Harris *v.* Thompson.

the court would not inquire for what purpose it had been continued. That the plaintiffs, by reason of the long occupancy by them and their grantors, of the surplus water, and their actual possession at the time of the alledged injury, could maintain an action for obstructing the use thereof, against any one not having a right to interfere with the same; and that it was not competent for the defendants to set up as a defense that the dam was a public nuisance.

2. That the objection, that no right of action could accrue to the plaintiffs, for a deprivation of the water, except under a license or purchase from the state, could only be raised by the *state*, and not by *strangers.*

3. That the statute of 1830 was a recognition of the rights of the mill owners, and *it seems*, a pledge on the part of the state that upon certain conditions the dam should be continued; which conditions were complied with by the mill owners.

4. That the statute of 1830, the performance of its conditions, and the re-building of the dam, were tantamount, so far as third persons were concerned, to a right to use, if not a sale of, the surplus water. And that the act was not unconstitutional.

5. That the dam being a state work, the act of 1830 was not invalid because its operation tended to benefit individuals; nor for the reason that the mill owners shared the burden of paying the damage to owners of contiguous land, and of supporting a dam.

6. That the neglect of the state to keep the dam in good preservation did not take away its public character, or authorize its destruction by individuals as being a public nuisance.

7. That to the extent that the dam was maintained by the state, or by its authority, it could not be a nuisance; and as the plaintiffs had a right to use the water which it furnished in that condition, they could recover for any injury sustained by abating it below its capacity, as maintained by the state.

Private property can not be taken for private use; but it is always subject to the necessities of the public, on compensation being made. And it is with the sovereign power to determine upon the necessity and expediency of the appropriation.

The courts have no power to review that determination. They may inquire whether the intended use is public or private; but when it is ascertained that the purpose is public, there the inquiry stops.

THIS was an action on the case, brought by John and William B. Harris against Thompson and eighteen others, for tearing away a part of the Fort Miller dam in September, 1846, by which act the mills of the plaintiffs thereon were stopped for want of water. The cause was tried in June, 1848, at the Saratoga circuit before Justice Hand. The declaration alledged that

the plaintiffs were possessed of certain mills in Northumberland, Saratoga county, to run which they were entitled to the use of " water and surplus water" of the Fort Miller dam, and that the defendants, with intent to prevent the plaintiffs from using the water, tore away part of the dam and thereby stopped their mills.

The 2d count alledged that the plaintiffs possessed the mills and used the waters of the Hudson river, which were diverted by the defendants, and the mills stopped; but it contained no averment that the plaintiffs were entitled to the surplus waters. Neither count set out the title of the plaintiffs. The defendants pleaded *non cul;* and gave notice, that although the plaintiffs as riparian owners had a right to enjoy the natural flow of the river on the west side, they had no right to use the waters or surplus waters of the Fort Miller dam, which was built in 1820 for the temporary purpose of slackwater navigation between Fort Edward and Fort Miller as a substitute, for the time being, for a part of the Champlain canal, and which by the completion of the canal was superseded and had become unnecessary to the public, and had been abandoned, and was kept up wrongfully and injuriously by the plaintiffs and for their private use and purposes, and the dam overflowed the lands of the defendants. The notice denied the plaintiff's right to use the water; and averred that the river was a public highway, and the dam a public and common nuisance by obstructing its navigation, endangering the property and the lives of the citizens, by overflowing the banks of the river and the highways thereon, and producing disease and pestilence and death among the inhabitants. Also that the dam was the property of the state, and could not be appropriated to local or private use without a vote of two-thirds of the legislature. That the state by their agent, the canal commissioner, had been induced unlawfully to change the location of the dam, and build it longer, on the plaintiffs' promise to build 100 feet, which 100 feet the defendants had not injured. And as to this agreement or right to use the water they set up the statute of frauds, there being no deed or writing, &c. and that the plaintiffs acquired no right to use the water. The suit was commenced in July, 1847. A verdict was rendered for the

Harris *v.* Thompson.

plaintiffs for $151,65. On the trial it appeared that the plaintiffs had a grist mill, plaster mill, and saw mill on the west end of the Fort Miller dam; and the Messrs. Bleeckers owned mills on the east end, the latter being occupied by L. L. Viele. There was a dam on the west side of the Hudson, near this place, with a wing running up stream, in the year 1794; also another wing on the east side, and in low water they were joined with brackets. There were mills then on both sides, owned by the occupants of the lots on each side respectively. In 1832 the plaintiffs and their grantors built a valuable grist mill on the west side of the river at an expense of about $6000; and in 1834 a plaster mill. In 1820 or 1821 the state built a dam across the river, which was about 4 feet higher than the old dam. The object of this dam was to make slackwater navigation connecting the canal at Fort Edward with the canal at Fort Miller. The next year the Bleeckers erected a wing dam to turn the water to their mills. In 1828 the canal from Fort Edward to Fort Miller was finished, which rendered the slackwater nearly useless. In 1829 an act was passed to pay damages sustained by the erection and continuance of the dam, and if the interest on the amount paid was more than the amount received for the use of the surplus waters, the commissioners were to lower the same so that further damages would not be sustained. And the land, notwithstanding the appraisal and payment of damages, was to continue the property of the owners. The same year one of the foremen of the canal took part of the planks off the dam, which were partially restored by Viele, under Bleecker; and a man by the name of Lewis displaced them. In 1830 an act was passed requiring the canal commissioners to replace the timbers of the dam, and the canal appraisers to "estimate all the damages arising to the several owners or occupants of land affected by the erection and continuance of the Fort Miller dam, in the manner provided by the laws of this state; but the lands on which said damages are sustained shall continue to be the property of the several owners, in the same manner as if this act had not been passed." (*Laws of* 1830, *chap.* 135, § 1.) The 3d section provided for deducting damages before then appraised. The 4th

Harris *v.* Thompson.

section was as follows : " If within 30 days after such appraisal as aforesaid ; or in case of appeal, if within 30 days after the final determination thereof, the persons interested in the continuance of said dam shall pay to the treasurer of this state a sum of money, which, after deducting therefrom the sum of $1500, the estimated amount of benefit to the state, shall equal the amount of said damages, in such case said dam shall remain ; otherwise, it shall be the duty of the canal commissioners to remove the same." And it was further provided, that, in case the above provisions were complied with, the commissioners should pay the damages so appraised, (deducting damages before paid,) and, if not complied with, the commissioners were to pay only the damages theretofore sustained by the erection and continuance of the dam, deducting as before. Under this act the damages were appraised at $2575,60, of which the Messrs. Bleecker paid $1074,99 on the 12th day of August, 1830. The dam was repaired by the state under this law. Col. Young testified, under objection, that the dam was built about the year 1820, for the purposes of slackwater navigation. That the commissioners knew the water must be raised 3 or 4 feet, and it was proposed and agreed with Burt & Harris, (occupants,) that, if they would build 100 feet of the dam, the commissioners would let them have the additional head ; and they had used the water ever since. That the state dam would have lessened their water power if they had continued to use their old dam. That no writings passed between them, and the arrangement was entirely verbal. That Burt & Harris built the 100 feet of dam. The evidence in relation to the stipulation between Col. Young and Burt & Harris, the former owners of the mills, was objected to, because the commissioners had no power to make such a contract ; and if they had, not being in writing it was void. The objection was overruled and the defendants excepted. In 1833 there was a freshet, since which the wings of the dam have been raised.

In 1842 the canal board made a report to the assembly, in which, without saying whether the dam was of sufficient use to the state to render it expedient to maintain it, they state that, if

otherwise, individuals who had contributed thereto had vested rights in its use. A map from the canal office was produced in evidence, on which, this dam and the river there and up to Fort Edward were included within blue lines, which it was testified indicated the land appropriated for the canal, and the line between the state and individuals. In September, 1845, the canal board, upon two petitions being presented, resolved that the board advise the acting canal commissioner to keep up this connection between the river and the canal, and repair the guard gates in such a manner as would be safe for the public works. The proof of this resolution was objected to because the board had no power over the matter, but the objection was overruled, and the defendant excepted.

In 1846, a freshet injured the dam, but it was repaired, and afterwards, the defendants tore off about seventy feet of the dam (not a part of the 100 feet,) by which the plaintiff's mills were stopped for a time. Dr. Bissell, when canal commissioner, gave permission in 1846, verbally and by letter, to the mill owners to make such repairs to the dam as they saw fit; but informed them, that after re-building the lock on the feeder, the state would go to no further expense. He testified that he gave no direction, but merely permission. N. Jones, late canal commissioner, testified that he had charge of the Champlain canal in 1845 and 1847, and he did not consider the feeder or dam assigned to any one. That they could be of no possible use to the state. That in 1845 he was applied to for permission to repair the dam, which he refused. By a letter dated September 5, 1845, he stated that he should not object to the mill owners putting on a few planks if they chose to do so at their own expense, but not at the hazard of the state as to the damage to others. In the assignment of duties to the canal commissioners in 1845 and 1846, the northern division "the Champlain canal, the Glen's Falls feeder and the point above the Troy dam" were included. Fort Miller dam was not specified. The plaintiffs and their grantors had been in possession of the land on the west side of the river for about fifty years. A large amount of testimony was given on both sides as to the effect of the dam, in obstruct-

Harris *v*. Thompson.

ing the navigation of the river for rafts, &c.; overflowing lands and highways; producing sickness, &c., &c.

After the counsel for both parties had summed up to the jury, the judge, among other things, charged them, that, *prima facie*, had nothing but the plaintiffs' possession and the injury to the dam by the defendants (or such of them as the jury should find had committed the injury,) been shown, the plaintiffs would be entitled to recover; for being in possession, they had the same rights as the riparian owner. That after the long occupancy shown in the case, had it been the ordinary question of riparian right, the plaintiffs had shown enough to recover against those defendants who should be found to have torn down the dam; to which portion of the charge the defendants' counsel excepted. The judge also further charged among other things as follows; 1st. That the plaintiffs, as riparian owners, were entitled to all the surplus water under the circumstances, and after so long an enjoyment thereof, strangers could not question that right. 2d. That if the dam was a public nuisance, the defendants could abate it for that reason. 3d. That the reparation of the dam in 1830 was the act of the state. 4th. That the act of 1830 was not unconstitutional. It did not purport to take private property for private uses, and no such construction should be given to it. The owners above, therefore, had not parted with their land to the plaintiffs by receiving compensation under that act. There was no such implied contract. Their property was taken for a public use, and as the fee (so far as appropriated by that act) remained in the owners, the public had only an easement, or control, or use of the river for the public purposes indicated in the act and subject to that use; the fee and all rights incident thereto, remaining in the owners. 5th. That the state having built the dam for public use it could not be a nuisance, in the condition in which the state kept it, until the state abandoned it in a lawful manner. 6th. That if the fee were in the state, and the state used the dam or water for other than public purposes, it so far laid aside its sovereignty, and its rights must be treated as those of an individual, and so with its grantee. But that the grantee of a dam built and conveyed by the state, or any one using the dam under the state,

could not be indicted for a nuisance for continuing the dam. 7th. But that as the state had not made any conveyance or occupied it for other than public purposes, any part of the dam made, either to rebuild, repair or preserve it, by individuals, for private purposes only, might be the subject of a nuisance ; that the plaintiffs could only use the water as they could in the condition in which the state kept the dam. Beyond that they might be liable, the same as all other riparian owners. 8th. And that all material additions to the dam, made by the plaintiffs for their own private benefit or use, and acts done by them to preserve the dam for the same object, whether upon their own motion or by a license from the canal commissioners, if the object of that license was to allow the plaintiffs to do these acts for their own benefit, and not in furtherance of the public use, provided the dam would have been a nuisance if not built by the state, were unauthorized, and said additions, and also the parts of the dam so preserved, might be a nuisance ; the canal commissioners in that case having no power to authorize additions to the dam or its preservation by individuals solely for their own private advantage ; consequently such license or pretended authority could not, in such case, affect the question of nuisance. 9th. But that the rule just laid down did not apply to the 100 feet built and kept in repair by the mill owners. As to that portion, the plaintiffs, after the license given, as shown by the testimony of the witness Young, and after the long acquiescence by the state in the repairs and use thereof by the plaintiffs, had a right to repair until the same was abandoned by the state ; that so far they might be deemed the agents of the state. 10th. That the state had the power to keep up the dam, without regard to the consequences, and so far as the state acted in the matter, the question of public necessity was not the subject of judicial inquiry. 11th. And that so far as the state had kept up the dam the court would not inquire for what purpose, and if the plaintiffs were in the peaceable possession of the surplus water, they could maintain an action for obstructing the use thereof, against any one not having a right to interfere except on the ground that it was a public nuisance ; and that it was not competent for the defend-

ants, in such a case, to set up the defense that the dam was a pub-
lic nuisance. 12th. That the plaintiffs were entitled to recover
all damages (if any) they had sustained by the defendants making
the dam less serviceable to them than it was in the condition in
which it was kept by the state, without regard to the question
of nuisance; and if it would not have been a nuisance, if the
state had been out of the question, then as riparian owners they
were entitled to recover for all damage they had sustained by
any act of the defendants alledged in the declaration and proved.
13th. That the jury should find whether additions and repairs
to the dam made by the plaintiffs for their own use solely, (if
any,) rendered it a nuisance by obstructing the navigation of the
river or by overflowing the banks so as to obstruct the highways,
or produce sickness, and if they found there was such a nuisance
the plaintiffs could not recover for any injury they had sustained
by the defendants abating said dam down to the capacity it had
as the state kept it. And the judge also explained to the jury
the law of nuisance, and what constituted a nuisance.

To the charge of the judge as contained in the paragraphs of
said charge as above specified, numbered 1st, 3d, 4th, 5th, 6th,
9th, 10th, 11th and 12th, and to every part of the charge favor-
able to the recovery of the plaintiffs, the defendants' counsel
specifically and severally excepted. The plaintiffs' counsel also
excepted to certain portions of the above charge. The judge
further charged the jury that the dam repaired in 1830 was the
dam of the state, and that there was no evidence that the state
had abandoned it. To which the defendants' counsel excepted.
The judge further charged the jury, that the state could not
abandon—that is, relinquish the right to—the dam, except by
legislative action, if at all. To which the defendants excepted.
The judge further charged the jury, that the plaintiffs had under
the arrangement with the state the same right that the state
could have had to keep up the hundred feet of dam, and no one
had a right to interfere with it. To which the defendants
excepted.

The judge further charged the jury, that the state having
erected the Fort Miller dam, it would not, by mere disuse by the

state, although no longer necessary for public purposes, be a public nuisance, even against the health and lives of the community, so long as actually kept up, and not abandoned by the state; that it could not be indicted, being kept up by the sovereign power; but the remedy was with the legislature, if found injurious to the citizens. The state works could not be abated as a public nuisance. To which the defendants excepted.

The defendants thereupon requested the judge to instruct the jury that the legislature can not erect or authorize the erection of a nuisance detrimental to the public health and destructive of the public safety; that if the jury should find that the dam produced disease and death, then it was not maintained by authority of law; that the state, by its legislative officers or otherwise, has no power to delegate to individuals the use of private property taken for public use by authority of law; that the agreement made by Col. Young with Harris and others was void—1st. By the statute of frauds, it not being reduced to writing; 2d. Because there was no authority, on the part of Col. Young; that if such agreement was valid, it conferred upon Harris no right to use the dam or water in a manner injurious to the public; that although Harris had authority to repair and maintain the dam, he could only do so to the extent of the public necessities required in the maintenance and repair; that property taken by the dam and water, although legally appropriated for public use, could be abandoned for public use without legislative action; that if the property was abandoned by the state, Harris had no authority to repair or maintain the dam. The judge refused so to charge, except as he had before charged thereon as above, and the defendants excepted. The defendants also requested the judge to submit to the jury for their decision, whether the state had abandoned said dam; but the judge refused and the defendants excepted. The defendants also requested the judge to instruct the jury, that if Harris raised and repaired said dam, the defendants were justified in abating it by any reasonable means. The judge refused so to charge, except as he had before charged, and the defendants excepted. The defendants also requested the judge to submit to the jury for their consideration, whether

---

Harris *v.* Thompson.

---

the dam was a nuisance, and if so of what kind. But the judge refused except as he had before charged, and the defendants excepted. The defendants also requested the judge to instruct the jury that the state, having legally appropriated private property for public use, after the public necessity requiring its appropriation and use has ceased, can not confer on, or continue in, an individual any right to use the same; that the statute of 1830, as far as it authorized the use of the dam or pond, or water or land covered by it, for private use, was unconstitutional and void. The judge refused so to charge except as he had before charged thereon as above, and the defendants excepted.

The defendants made a case and moved for a new trial.

*William Hay,* for the defendants.

*S. Stevens,* for the plaintiffs.

*By the Court,* HAND, J. The Hudson river, at the location of the dam in question, is a public river for the purposes of navigation; or, as it is termed, a public highway; though being above the flow of the tide, it is private property in other respects. (*Palmer* v. *Milligan,* 3 *Caines,* 207. *Commissioners of Canal Fund* v. *Kempshall,* 26 *Wend.* 404. *People* v. *Platt,* 17 *John.* 199 *Angell on Water Courses,* 159.) Any obstruction to its navigation is, *prima facie,* a public nuisance. (*Jennings ex parte,* 6 *Cowen,* 518, *and note. Ang. on Wat. Courses,* 201, *and the cases there cited.*) The doctrine, that the proprietor of the bank of a river owns to the thread of the stream, as applicable to the Hudson, was somewhat shaken by the opinions of some senators in the case of *The Canal Appraisers* v. *The People,* (17 *Wend.* 571; *S. C., Canal Comm'rs* v. *People,* 5 *Id.* 423.) But that controversy may, perhaps, be considered as decided upon the peculiar phraseology of the grant, practical location, and the supposed applicability of the civil law. At all events, these considerations, and the close vote on that occasion, make it not conclusive against the old rule; and the subsequent cases of *The Comm'rs of the Canal Fund* v. *Kempshall,* and *Child* v. *Starr,* I think, may be considered as restoring that rule

---

Harris v. Thompson.

---

to its former authority. (26 *Wend.* 404. 4 *Hill*, 369.) Were it otherwise, the long occupancy by the plaintiffs and their grantors, and their actual possession at the time of the alledged injury, would be sufficient, *prima facie*, against strangers.

It is said, that it being proved that the state built the dam, the plaintiffs can not tap it, or use the surplus waters; and that consequently no right of action accrued for a deprivation of the water, unless they can show a license or purchase from the state. (*See Varick* v. *Smith*, 5 *Paige*, 137.) But there is no proof that the state ever made compensation to the plaintiffs for the water the plaintiffs were using at the time of this transaction. The plaintiffs, too, were in possession, and the defendants, irrespective of the question of nuisance, were strangers; and again, if it was state property no one could object but the state. (*Varick* v. *Smith*, 5 *Paige*, 137; *S. C.* 9 *Id.* 563. *Stiles* v. *Hooker*, 7 *Cowen*, 266. *And see Russel* v. *Men of Devon*, 2 *T. R.* 660.) And it would seem, the plaintiffs would be entitled to the surplus water, without purchase or agreement; at least, unless otherwise disposed of by the state. (*Varick* v. *Smith, supra.*)

The counsel for the defendant further insists, that the charge in relation to the statute of 1830, was incorrect. That law was a recognition of the rights of the mill owners, and, I am inclined to think, also a pledge on the part of the state, that, upon certain conditions, the dam should be continued. There was a compliance with those conditions; the payment of the entire sum by the Messrs. Bleeckers enuring to the benefit of all the mill owners. The phraseology of the 4th section is very inartificially expressed, but the intent is apparent. And it may also be considered that this statute, the performance of its stipulations, and the rebuilding of the dam, was tantamount, as to third persons, to a license to use, if not a sale of, the surplus water. And if so, it would not be unconstitutional. Private property can not be taken for private use. (2 *Kent*, 339. *Varick* v. *Smith, supra*. 1 *Perkins' Domat*, 248, *et seq.* *Const. of* 1821, *art.* 7, § 7. *Of* 1846, *art.* 1, § 7. 9 *Paige*, 559.) But is always subject to the necessities of the public, on making compensation. (*Id.* 12 *Co.* 12. *Vattel, b.* 1, *ch.* 20, § 244, *et seq.* *Dyer*, 36, *b.*

*Gardner* v. *Village of Newburgh,* 2 *John. Ch.* 162.   2 *Bur-lamaqui, p.* 3*, ch.* 5.   *Rogers* v. *Bradshaw,* 20 *John.* 734. *Bloodgood* v. *M. & H. R. R.* 18 *Wend.* 1.   *Coates* v. *Mayor of New-York,* 7 *Cowen,* 585.   *Mayor of New-York* v. *Lord,* 17 *Wend.* 290.   15 *Vin. Necessity, A.* 8.)   And it is with the sovereign power to determine upon the necessity and expediency of the appropriation. (*Id.*) And the courts have no power to review that determination. (*Id. Smith's Stat. and Const.* 467.) They have no sovereign power ; they do not make laws, but administer justice.   They may inquire whether the intended use is public or private.   Certainly, this may be done where the property is not taken into the immediate charge of the state ; but the public are to derive benefit through the operations of a corporation.   That was one question in *Bloodgood* v. *Mohawk & Hudson R. R. Co.* (*supra.*)   But when it is ascertained that the purpose is public, the inquiry stops.   If it appeared by the act itself that the dam was to be repaired or maintained, solely for the benefit of the mill owners, the court would consider it nugatory, so far as it purported to authorize the appropriation of private property.   Especially, in a case in which the state did not take and retain the control and management of the property.   A state may lay off its sovereignty for certain purposes. (*Bank of U. S.* v. *Planters' Bank of Georgia,* 9 *Wheat.* 907.   *Ang. & Ames on Corp.* 29.   *Mayor, &c. of New-York* v. *Bailey,* 2 *Denio,* 433.)   But this work was then, and had long been, a state work ; and the law was not invalid, because its operation tended to benefit individuals, directly or indirectly ; nor for the reason that the mill owners shared the burden of paying the damage to owners of contiguous land, and of supporting a dam. The dam belonged to the state, at least *sub modo,* and was under its control, and was used, or was subject to be used, by the state. That particular portion kept in repair in pursuance of the alledged agreement with Col. Young, belonged to the state, as much as the other portions.   And, in this view, it is immaterial whether that was a valid contract.

Nor did the neglect of the state to keep the dam in good preservation, take away its public character.   The state can not be

Harris v. Thompson.

deprived of its canals because its officers suffer them to become dilapidated. Nor have they power to declare the public property abandoned. The completion of the canal, parallel to the river, it is true, has rendered this dam and the side cut comparatively useless to the state. But that does not authorize its destruction by individuals.

But, admitting the dam to be erected by the state, and for state purposes, it is contended that, if it is injurious to health, and endangers the lives of the citizens of the state, it is a nuisance. The learned counsel for the defendants, in his request to charge, put this point to the court in a strong light. It was disposed of at the circuit with reference to the case before the court, and, on that point, I had no difficulty. As an abstract question, it would be painful to suppose that the state, except in cases of immediate and absolute necessity, could, legally erect and maintain works known to be destructive of the health and lives of its citizens. It has been said, that a law, opposed to natural equity, is void. (*Day* v. *Savage, Hob.* 87. *Bonham's case,* 8 *Co.* 234. 1 *Bl.* 41, *note* 3. *And see Medler* v. *Bishop of Winchester, Hob.* 224.) But if this be so, which it is not necessary now to decide, it must be some flagrant enactment; and then, I suspect it would be very difficult, in most cases, to obtain jurisdiction of the question. War is destructive of life and property, and, yet, it was never pretended that a government or its agents were liable to respond in courts of justice, because the war was inexpedient or unjust. (*And see Martin* v. *Mott,* 12 *Wheat.* 19; *Vanderheyden* v. *Young,* 11 *John.* 150.) Besides, sovereignty, being the fountain of justice, can not be sued in its own courts. Fortunately, there is no danger of such injustice in a country where the laws are made by the people or their immediate representatives. If, through inadvertence, an instance should happen, no doubt it would be speedily redressed by legislation.

The decision at the circuit was, that, to the extent that the dam was maintained by the state, or by its authority, it could not be a nuisance. But, so far as it was maintained or repaired by private persons solely for their own benefit, it might be; even

Harris v. Thompson.

though a license to that effect had been given by the state officers. That, so far as they maintained it for private use and benefit, the plaintiffs stood upon the common ground of riparian owners, and could recover, unless the dam was a nuisance and was abated for that cause. And, in that case, it might be a nuisance. But, as it could not be a nuisance in the condition the state kept it in, and as the plaintiffs had a right to use the water it furnished in that condition, they could recover for any injury sustained by abating it below its capacity as maintained by the state.

The principle, that it could not be a nuisance in the condition in which the state allowed it to remain, seems unquestionable. It is a legal solecism, to call that a public nuisance, which is maintained by public authority. Even an act of a corporation, which would otherwise have been a nuisance, has been deemed lawful, because authorized by its charter. Both bridges would have been considered nuisances, in *Charles River Bridge* v. *Warren Bridge*, if they had not been authorized by statute. (11 *Pet.* 420, 559.) In many reported cases, the only question was, whether the act complained of, was in conformity to the statutory license. (*Renwick* v. *Morris*, 3 *Hill*, 621. *Calkin* v. *Brown*, 4 *Wend.* 667. *The Queen* v. *Great North of England Railway Co.*, 9 *Ad. & Ellis, N. S.* 315. *King* v. *Scott*, 3 *Id.* 542. *Rex* v. *Pease*, 4 *B. & Ad.* 30. *Rex* v. *Morris*, 1 *Id.* 441. *First Baptist Ch. &c.* v. *Utica and Sch. Railroad Co.* 6 *Barb. S. C. Rep.* 313, *and cases there cited. Lynch* v. *Stone*, 4 *Denio*, 358.) In some of these cases, deviations from the license were held, *pro tanto,* nuisances.

From some *obiter* remarks in a few cases, it might, perhaps, be inferred that it was an open question, whether laying rails in a street in a city, might be a nuisance. (*Hamilton* v. *N. York and Harlem Railroad Co.*, 9 *Paige*, 171. *Drake* v. *Hudson River Railroad Co.*, 7 *Barb.* 508. *Brower* v. *Mayor of New-York*, 3 *Barb. S. C. Rep.* 254.) But where express authority to do a particular act has been given by the legislature to a corporation, for purposes deemed of public utility, I think there could be no difficulty. If not expressly given, or if there be an

Harris *v.* Thompson.

abuse of the authority, there is no protection, further than is enjoyed by private enterprise. The cases of *The Mohawk Bridge* v. *Utica and Schenectady Railroad Co.*, (6 *Paige*, 554,) and *Hudson and Delaware Canal Co.* v. *New-York and Erie Railroad Co.*, (9 *Id.* 323,) were conflicts between corporations possessing franchises, granted on the ground of public benefit; and in none of these cases was the charge of nuisance sustained.

It is said, the king can not pardon, or grant dispensation, for some nuisances. Where a bridge is repairable by a subject, the king can not pardon him from repairing it, because all the subjects of the realm are interested in it; (*Plow.* 487. 12 *Co.* 30. 2 *Hawk. P. C.* 543, § 33. *Vaugh.* 333. 4 *Black.* 398. *And see* 3 *Hall. Const. Hist.* 84, *et seq.*;) nor grant a dispensation or license to, or prospective pardon for, that which is *malum in se.* (12 *Co.* 30. *Vaugh.* 332.) But that is a question of prerogative, and does not apply to the power of parliament to declare what shall not be a nuisance; for that power is absolute and without control. (1 *Bl.* 162.) The power of our legislature is the same, within the limits prescribed by the constitution. That has fixed limits to the exercise of legislative authority, and the forms of government are here delineated by the mighty hand of the people. (*Patterson, J. in Van Horne's Lessee* v. *Dorrance,* 2 *Dall.* 308.) It has been said that the general and state government, between them, possess sovereign power. (*Savage, C. J. in People* v. *Saratoga and Rensselaer Railroad Co.*, 15 *Wend.* 133.) This proposition requires qualification. Some powers are withheld by the constitution, and are therefore dormant, until the people, with whom, here, is the *juræ summi imperii*, shall, by an alteration of the constitution, see fit to exercise it. But within these limits, unless, perhaps, when it violates natural equity, legislation is without control. When this power bears upon individual interests, undoubtedly, it should be clearly expressed, and clearly within the constitutional limits. In this country, as has been quaintly observed, unlike monarchical governments, it is all against one, instead of one against all; and no doubtful powers should be exerted against private rights. The royal prerogatives and powers, and the rules for enforcing them,

as defined in the Saltpetre case, (12 Co. 12,) would here be very unacceptable. But, as we have seen, this right of eminent domain, which is the sovereign or transcendental power or right of making use of any property the subject possesses, for the necessities of the state, has been exercised in favor of railroads; and the authority sustained by our highest court. (18 Wend. 1.) The case before us stands on a broader foundation. Our canals are the property of the state, the *public domain ;* which, the people have declared, by the constitution, shall remain the property of the state and under its management forever. (*Const. art.* 7, § 6. *Const. of* 1821, *art.* 7, § 10. And see 1 R. S. 226, § 52; 218, § 5; *Laws of* 1837, *ch.* 457, § 6; *Baker* v. *Johnson,* 2 *Hill,* 348.) Whether this forbids the abandonment of any of them or any part thereof, in future, even by legislation, it is not necessary now to decide. Most certainly, no private person can destroy our public works because the state neglects them, or because he considers them dangerous or injurious. And a prosecution by the people, for doing what the people have enacted shall be done, would be an absurdity. And not less so, if done, not only by the mandate of the people, but on their own property and for their benefit. The construction contended for by the defendants would be subversive of law, and tend to anarchy.

New trial denied.

