DETERMINED IN THE

# FIRST DEPARTMENT,

AT

# GENERAL TERM,

## January, 1883.

---

IN THE MATTER OF THE APPLICATION OF EDWARD COOPER, MAYOR OF THE CITY OF NEW YORK, AND OTHERS, TO ACQUIRE TITLE TO LANDS FOR A PUBLIC MARKET.

*Public market — lands may be taken for it, by the exercise of the right of eminent domain — the exercise of such right is legislative, not judicial — what evidence is required of an inability to agree as to price — what is a public market.*

Land may be taken by the exercise of the right of eminent domain for the establishment of a public city market.

The necessity of taking private property for public use is not a judicial question, but one of political sovereignty, to be determined by the legislature either directly or by delegating the power to public agents, proceeding in such manner and form as it may prescribe.

It is not essential to the definition of a public market that it should be a place open to all persons for the sale of all commodities. It may be a public use although limited to the sale of a particular kind of produce.

Where commissioners are authorized to agree upon a price for land to be taken for a public use, and in case they cannot agree with the owners to take proceedings to acquire it by the exercise of the right of eminent domain, it is sufficient evidence that the price cannot be agreed upon, that the owners have been requested to state the lowest prices at which they were willing to sell; that such owners have stated such prices, and that the commissioners refused to purchase the land at such prices.

*Semble,* that where an act provides that a proceeding to take land by the exercise of the right of eminent domain shall be taken by the mayor, comptroller and three aldermen of a city, the proceedings on behalf of the city for such pur-

pose are not vitiated or affected by reason of the fact that the terms of office of such persons have expired, in the absence of any application by the property owners who complain, to have their successors in office substituted in their places.

APPEAL by William Collins from an order of the Special Term denying a motion made by him, as the owner of a parcel of land sought to be acquired herein, to vacate the order appointing the commissioners in the above entitled proceeding.

*James A. Deering*, for William Collins, appellant.

*Arthur Berry*, for the mayor, etc., respondents.

BRADY, J.:

On the 17th of May, 1880, as enacted by chapter 191, laws of that year, the legislature of this State passed " an act to provide for the establishment and maintenance of a public market place for farmers and market gardeners, in the city of New York, for the acquisition of lands for this purpose and for the regulation and management of the same." This act provided that certain lands situate in the Ninth ward of this city, should be declared a public market place, where farmers and market gardeners might dispose of their farm or market produce, and that the mayor, the comptroller and the three aldermen of the city, elected in the aldermanic district consisting of the Eighth, Ninth, Fifteenth and Sixteenth wards, were authorized to purchase, in the name of the mayor, etc., such portions of land therein described as were not the property of the city, provided that the comptroller concurred in the purchase and the price agreed upon between the owners thereof and the said officers.

The mayor, comptroller and aldermen, were also authorized to acquire said land, or any portion thereof, for public use as a public market, by application to the Supreme Court, for the appointment of commissioners of estimate and assessment, if the lands could not be acquired by purchase. It was further provided that such proceedings should be prosecuted on petition of the mayor, etc., in such manner as was provided in statutes relative to street openings, except that not more than $50,000 should be assessed upon the property benefited by the improvement. It also provided

that the counsel to the corporation should perform all the legal services required in the conduct of the proceedings, and that after the lands had been acquired, the commissioner of public works should prepare the same for occupancy; also, that the mayor, etc., should meet and organize as a commission under said act, and that they should serve without compensation. It was also provided that revenue bonds to an amount not exceeding $200,000 should be issued by the comptroller, for the purposes of defraying the expenses to be incurred in carrying out the provisions of the act, $50,000 of which should be raised by an assessment on the property benefited by the improvements and the balance included in the annual tax levy. It was provided also, that in case of a deficiency arising from any cause, the board of estimate and apportionments were authorized and directed to make an appropriation to meet the same. It was also provided that maps should be made, and that the land set apart by the act for the purposes of a public market should be kept for the use of the farmers and market gardeners, and should be under the exclusive charge and control of the finance department. It was further provided that all acts inconsistent with the act should be repealed, and that it should take effect immediately.

In pursuance of the provisions of the act, Edward Cooper, who was then mayor of New York; John Kelly, who was then comptroller, and John J. Morris, John W. Jacobus and Bernard Goodwin the three aldermen of said city, elected in the aldermanic district, consisting of the Eighth, Ninth, Fifteenth and Sixteenth wards thereof, met and organized on the 21st day of May, 1880, by electing Edward Cooper, the mayor, chairman, and George B. Deane, Jr., secretary; and proceeding to business, after this organization, the commission passed a resolution directing the comptroller to ascertain upon what terms the owners of the land included within the limits of the proposed market would sell their property.

On the twenty-eight of July following, at a meeting of the commission, the comptroller presented a report stating the prices at which the owners of land were willing to sell their lots. These prices were not deemed satisfactory, and the commission passed a resolution, that each of the owners of said lots be requested to state in writing, the lowest prices at which he was willing to sell his

lot or lots, and that in each instance the price so stated be treated as the ultimate price and offer of the person promising said price.

It appears that a copy of this resolution was sent by the secretary to each of the owners of land within the lines of land proposed to be taken or purchased, and a reply thereto was sent to the comptroller by each of the property owners. The result of this was reported to the commission by their secretary on the 28th of August, 1880.

The prices named were not acceptable to the commission and they passed a resolution directing the counsel to the corporation, to prepare a petition and take the necessary legal proceedings, by the appointment of commissioners, to acquire title to the land required for the market.

In obedience to this resolution a petition was prepared, duly verified, and a copy served upon all the owners of property sought to be acquired, with a notice that an application would be made to the Supreme Court for the appointment of commissioners of estimate and assessment on a day therein mentioned.

On the 13th of December, 1880, in pursuance of such notice, a motion was made for the appointment of a commission of estimate and assessment. It is shown that various owners of property involved appeared in person, or by attorney, and that a petition on behalf of the property owners, and which was signed by Collins, the appellant herein, was presented to the court praying for the appointment of Mr. Benjamin P. Fairchild as one of the commissioners. The court, after hearing all the parties in interest, made an order appointing Messrs. William H. Wickham, Benjamin P. Fairchild and Nicholas Haughton, commissioners under the act.

The commissioners thus appointed, who were duly qualified, organized and took such proceedings, that on or about December 19, 1881, their preliminary report was filed for the inspection of parties in interest, and a notice of that fact, and that any persons objecting to the report should file their objections to the same, with the commission, on or before January 28, 1882, and that they would then have an opportunity of being heard before said commissioners during the space of ten week days, was duly published and posted. In pursuance of this notice, the appellant presented his objections to the commissioners, who, it appears, have them still under con-

sideration, not having yet made their final report. This is a brief history of the proceedings instituted and taken under the act of 1880, *supra*.

The appellant's appeal is based upon the propositions.

*First.* That the act of 1880, is unconstitutional and void because it conflicts with section 6 of article 1, which provides that "no person shall be deprived of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation."

*Second.* That the act is in conflict with section 6 of article 1 of the Constitution, because it does not provide for "just compensation" for the land to be taken.

*Third.* That the act conflicts with section 18, of article 3 (as amended March, 1874), which provides that "the legislature shall not pass a private or local bill in any of the following cases:

\* \* \* \* \* \* \*

Granting to any private corporation, association, or individual, any exclusive privilege, immunity or franchise whatever."

*Fourth.* That the statute violates the constitutional provision providing that the compensation for the private property to be taken shall be ascertained by three commissioners appointed by a court of record.

*Fifth.* That the persons named in the act for that purpose have not attempted to mutually agree upon a price for the lands required with the owners thereof before instituting these proceedings, and the petition for the appointment of commissioners does not set forth any reason for such inability.

*Sixth.* That the present applicants, by whom this proceeding was initiated, had no authority to commence the proceedings and cannot now maintain them.

It may be said, in answer to the last objection, that when this proceeding was instituted the persons in whose names it is continued were thus designated in the act of 1880 ; and as they were the officers then in office it was their duty to make the application, and it was also the duty of the court to recognize them as the proper persons to institute it. They were the mayor, the comptroller and the aldermen elected in the aldermanic district consisting of the Eighth, Ninth, Fifteenth and Sixteenth wards. It was for them.

under section 1 of the statute, to make the purchase, having authority on behalf of the mayor, aldermen and commonalty of the city of New York to acquire title to the lands, and for that purpose to file and present a petition to the Supreme Court for the appointment of commissioners.

The proceeding, therefore, was entirely regular, and the order in that respect was properly made and entered. If the appellant desired any change in that respect, as one which would be beneficial to him in any way or contribute to the success of the contemplated enterprise, he might perhaps have asked, by application therefor, to have the mayor, the comptroller and the aldermen of the aldermanic district mentioned who succeeded those named in the original order substituted. But he has not thought proper to do so; and the omission on the part of the corporation to do it seems to be in any aspect wholly immaterial, because whatever names may be adopted or continued in the proceeding itself the result is for the benefit of the mayor, aldermen and commonalty of the city of New York, in accordance with the provisions of section 1 of the act of 1880, already referred to.

In reference to the objection that the officers named in the act never attempted to agree with the appellant upon a price for his lots, or to purchase the same as required by the act, it is sufficient to say that the affidavit of Mr. Collins, the appellant, upon which the motion under consideration was based, contains this statement: "After the passage of the act I was requested by the commissioners therein named, or by some one at their request, to name a price which I would take for my said premises, and in compliance with said request I stated I would take the sum of twenty-five thousand dollars. I believe a copy of my written communication to said commissioners is correctly printed in the minutes of the said commissioners in the city record."

It appears, as we have already seen, that the act authorized the officers named for that purpose, to purchase certain lands for a market site, and at such prices as might be mutually agreed upon; provided, however, that in no case should the lands be purchased for the prices agreed upon, without the concurrence of the comptroller, and that accordingly, at the first meeting the officers resolved that the comptroller be requested to ascertain the terms upon

which the land required to be purchased might be obtained; and such proceedings were had upon the coming in of the report of the comptroller; that each of the owners, by resolution adopted by the commission, was requested to notify them, by a communication to be addressed to the comptroller, of the lowest price which each would accept for so much of the land owned by him, lying within the district required; and that the resolution declared that in each instance the price so stated would be considered and treated by the officers as the ultimate offer and price proposed by the person making it. The effect of this provision, therefore, was to seek from the owners of the land within the district required, a statement of the lowest price for which they would be willing to sell the property owned by them and embraced within it; and the appellant, in pursuance of that resolution, in a written communication, stated that the sum of $25,000, was the lowest price that he would accept. And it was only necessary, therefore, for the commissioners, when they adopted this mode of ascertaining whether a purchase could be accomplished or not, to determine whether $25,000, was a proper price for them to pay for the property owned by the appellant. They had obtained from him a statement of the lowest price that he would sell for, and they declined to accept it.

After the receipt of this information from the appellant and others, by a preamble in which they stated that they had received from each of the owners, or their legal representatives, the lowest price for the property offered, and whereas, they were unable to agree with the owners, or any of them, on the price of the land necessary to be acquired, the commission resolved that the counsel to the corporation should take the necessary proceedings to acquire the land, according to the statute in such case made and provided. This was a declaration, by a resolution, that the price demanded would not be paid; and, therefore, having received the statement of the lowest price which the owners would consent to accept, it is quite apparent that the commission was unable to agree with the owners, or any of them, on a price for the lands to be paid by them. If in writing the communication to the comptroller, in answer to the request which was made, under and by virtue of the resolution adopted, the owners had stated that although they named the sum mentioned as the lowest price which would be accepted for the

property, they would be willing to accept an offer, or to consider any further proposition, the case would present an entirely different aspect. But the statement was an absolute one, as they were asked to state the lowest price; and as that was not and would not be acceptable, it was unnecessary to continue the negotiation or to attempt to accomplish any barter or any purchase of the property by agreement. The commission had stated in the resolution, and the owners had been advised, that the prices which they named would be considered and treated as the ultimate offer and price of the persons naming them, and that at once closed the door upon any subsequent effort to accomplish the purchase by agreement. The prices given were the lowest, and were to be treated as the ultimate offers, and, therefore, to be regarded as the end of the attempt to acquire title by purchase, if the commission would not pay them.

These circumstances prove conclusively that there was a failure to agree upon the price for the purchase of the land, within the meaning of the statute, for all that was necessary to be done had been done; and this absolved the commissions from making any further efforts to accomplish, by agreement with the various owners, the title to the property desired. The petition properly set forth the fact stated, namely, that they had not been able mutually to agree upon a price or prices for the lands required, and therefore had not been able to acquire the title thereto. The objection, therefore, to which this reasoning relates, must be regarded as valueless.

The first constitutional objection taken on behalf of the appellant, namely, that no person shall be deprived of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation, cannot be sustained. As very properly remarked upon the brief of the respondents, "Lands used for the purposes of a public market have in this city, for 200 years at least, been treated by the legislature and courts of this State, and by the Colonial authorities thereof before its separation from Great Britain, as devoted to public use. Public markets and market houses were recognized in New York, then a British province, as public buildings as early as 1686." Indeed, the Dongan Charter recites, that whereas, the citizens, etc., of New

York, have erected at their own cost, several public buildings, including two market houses; therefore, the Lieutenant Governor Dongan, in the name and on behalf of the king of England, grants and confirms unto the mayor, aldermen, etc., of New York, the said * * * "two market houses, and all the rights and privileges thereto belonging." (See Dongan Charter, §§ 1 and 2, pp. 4 and 5, vol. 1, special laws affecting the city of New York.) And by the Montgomerie Charter of 1730, the mayor, etc., were given power to have, hold and keep markets · at five several places. And the charter further provided, that the mayor, etc., and their successors, should and might have, hold and keep such and so many other markets, at such and so many other times and places in the city, as should from time to time be ordered, established, erected and appointed by the common council of the city. (See Montgomerie Charter, § 36.) And it appears further, that on the 14th of October, 1732, an act was passed by the governor and council and the general assembly governing New York, ratifying and confirming unto the mayor, etc., all their rights and privileges. And the charter of 1873 (chap. 335, laws of that year), by section 17, confers upon the common council certain powers, and among others, by subdivision 20, "in relation to the construction, repair, care and use of markets." It was declared in that charter, that the Dongan and Montgomerie Charters, when not inconsistent with the provisions of the act, should remain in full force and effect. It will have been perceived that the provisions of the Dongan and Montgomerie Charters conferred upon the mayor, etc., the right to establish, maintain and regulate the public markets, and that these provisions having been preserved, are in ·full force and effect. And it may be said here, that if there were no decisions to be found upon the subject, and the question were *res nova*, there could be little doubt that the taking of property for a market was devoting it to a public, and not a private use. But the question has been considered substantially, in certain adjudications, to which reference will be made.

In the case of the *People ex rel. Flagg* v. *Lowber and the Mayor* (7 Abb. Pr., 176), which was an action brought to restrain the mayor, etc., from completing the purchase of land for a market,

Judge INGRAHAM, who was perfectly familiar with the laws governing New York, said:

The common council has the power, under their charter, to provide for and regulate markets. They have the sole right to establish markets. It is a franchise which was conferred upon them by the supreme authority, and with it is conferred all necessary power to carry into effect the exercise of that right. (See, also upon this subject, *St. John* v. *The Mayor*, 6 Duer, 315.)

And in *Ketchum* v. *City of Buffalo* (14 N. Y., 356), it was held that the authority to establish and regulate markets being expressly conferred upon the city of Buffalo by its charter, the power to purchase a site therefor resulted as a necessary incident. Judge SELDEN, in his opinion, said : " It is, I apprehend, a sound rule, that when power is given to a corporation to do an act, it has a right to do whatever is necessary to accomplish the act. * * * A market is a public place for the sale of commodities." To the same effect, see, also, *Peterson* v. *The Mayor* (17 N. Y., 449); Kent's Charters (p. 100, § 17, and p. 229).

It will, doubtless, have been observed that the act of 1880, under consideration, declares the object and purpose of the proceeding to be taken, namely, to acquire the title to lands for public use as and for a public market place, which would seem to be in itself sufficient to uphold the power of the city to take this property by the exercise of the right of eminent domain. The Constitution does not prohibit the exercise of such a right, but declares only that private property, for a public use, shall not be taken without just compensation being given therefor.

It may be said also in connection with this subject, as suggested by the learned counsel for the respondents, the legislature had ample power to decide that it was necessary to take this land for a public market. They, and not the property owners, were the judges of the necessity of it, and it seems to be established that the taking of private property for public use is not a judicial question, but one of political sovereignty, to be determined by the legislature, either directly or by delegating the power to public agents, proceeding in such manner and form as it may prescribe. (*People* v. *Smith*, 21 N. Y., 595; *Matter of Townsend*, 39 id., 171; *Matter of Dean Street*, 53 id., 60; *Harris* v. *Thompson*, 9 Barb., 350.)

In the case of the *People* v. *Smith*, the court said, in discussing this power of the legislature, that "it may be exercised by means of a statute, which should at once designate the property to be appropriated, and the purpose of the appropriation." In this case the legislature did designate the land to be taken and the purpose for which it was taken.

The learned counsel for the appellant, who presents a very able brief, and who has displayed very great ingenuity in the elaboration of his points, seems to think that because all persons for the sale of commodities would not be admitted to the market, it is not a public market for a public use. But this is a grave error. It is a market for the concentration of a particular kind of produce, a centralization of it so to speak, and a benefit to the public, who know that in a particular locality they can find the articles designated to be sold there. It is a public market for the benefit of the public, where the sale of certain commodities takes place, and where, therefore, they can be found, and the erection of which must consequently be regarded as a public convenience. It is the appropriation of a certain portion of the city for the sale of certain commodities to which the public may resort for such purchases as they desire to make of the articles which are there exhibited for sale. It would be impossible in any one market in the city of New York which has been constructed or laid out, to put the different articles which are properly called "market produce," brought to the city for sale; and therefore the necessity of having several of them for the purpose of accommodating the population or purchasers. The construction of a market for the sale of a particular kind of produce, is similar in all respects to the appropriation of land for the use of a railroad, which is to be used by the railroad company making application for it. It is a public use, although only benefiting the particular persons who use it, and the company which enjoys the franchise acquired by obtaining title to the land. It is thought that this constitutional objection, as already suggested, cannot be maintained for the reasons given, and that the learned judge at Special Term, was right in saying that the lands which were sought to be acquired were to be appropriated for a public use. These views dispose of the third proposition in which it was said that section 18 of article 3 (as amended March, 1874) was violated, because the act

of 1880 was a private bill granting to a private corporation an exclusive privilege, immunity or franchise.

There is no force either in the second proposition, namely, that the act is in conflict with section 6 of article 1 of the Constitution, because it does not provide for just compensation. The act of 1813, under which the proceedings were instituted, contains all the necessary provisions to secure compensation for land taken. The act of 1880 explicitly provides that just and full compensation shall be given for all the land that may be taken for the purposes of the market. It provides, as already stated, that the proceedings of the commissioners of estimate and assessment shall be as prescribed under the street opening act of 1813 (chap. 86), and the laws amendatory thereof and not inconsistent with the provisions of the act, and a provision, as we have seen, was made for the issue of revenue bonds to defray the expenses to be incurred in executing the provisions of the act, limiting, it is true, the amount to a sum not exceeding $200,000. It is claimed, however, by the appellant that a limit upon the sum to be allowed for the land is declared, namely, that it shall not exceed $200,000; and he states in his affidavit that he does not believe that the sum of $200,000 will be a sufficient sum to pay a full and fair compensation for the property taken. We can all understand that it is the desire of the appellant to obtain the highest price that he 'can for his property, and that the other property owners will be doubtless stimulated by a similar ambition. He also states that he has been informed that the commissioners were advised to keep their awards below the sum of $200,000; and by reason of such restraint or advice they were compelled to make their allowance of compensation below the full and true value of the lands required to be taken. This statement is not correct, because it appears by the affidavits of the commissioners that the sum of $200,000 was, in their judgment, sufficient to compensate the owners of all the lands required to be taken in the proceeding; and they denied that they had been advised to keep the total awards within the sum of $200,000, or that they had decided the awards upon the theory or upon the belief that the statute, under which the proceedings were had, restrained them in respect to the total sum to be paid so as to compel them as such

commissioners to make their allowance of compensation below the full and true value of the lands required to be taken.

It will have been observed that there is a provision made for any deficiency arising from any cause, which shall be provided for by the board of estimate and apportionment by including the same in the annual appropriation first made after the amount of the deficiency, if any, shall be ascertained. The limit of $200,000, cannot be said in any reasonable view of the subject, to place the proceedings within the inhibition against taking property without a just compensation. If the land were really worth more than $200,000, assuming the limit to exist as claimed on behalf of the appellant, then the project would fail, because the amount allowed for the purchase is too small to accomplish it.

But it is not necessary at present to consider this question further, for the reason that by the affidavit of the commissioners it appears that the sum named is sufficient to acquire the title to all the property necessary by paying its fair value, and it must be assumed that the evidence which is given by them is the more reliable, because it must be regarded as entirely disinterested, emanating from a faithful observance of their duties as commissioners in the discharge of the trust reposed in them by the court, and for the further reason that the commissioners themselves, having the power to determine what amount should be awarded for the land taken, arrived at the conclusion that the sum allowed by the legislature would be sufficient for the purpose of accomplishing the object in view.

The proposition contained in the fourth point has been sufficiently answered in the views expressed, and it is not necessary to answer it separately.

For these reasons we think the order should be affirmed, with ten dollars costs, and the disbursements of this appeal.

Daniels and Dwight, JJ., concurred.

Order affirmed, with ten dollars costs and disbursements.