Opinion of the court, by
Judge Collet:
The bill states that complainant was seized in fee simple, .and was in possession of a tract of land situated on the Scioto river, in the county of Pickaway; that the canal commissioners, to supply the canal with water, have erected a dam across the said river, which is abutted on the said land, and have constructed a feeder from said dam to the canal; that the feeder passes through said land; that the defendants, H. Neville, James Neville, and J. Cushing, are the owners of a mill on said river a short distance below said tract of' land; that they have no right to abut a dam against said land, or to dig a mill-race on it, or in any manner to use it, or any part of it, to convey water to said mill, or for any other purpose; that neither the complainant nor any other person, who was authorized, ever consented or agreed that they should do so; that the defendants pretend that they, by virtue of an *act of the legislature, passed on March 8,1831, entitled “ an act concerning the surplus water at the Scioto dam near Circleville,” have authority to construct a waste weir in said feeder, .and to dig a race from it to the head race of. said mill to supply it with water without the consent and against the will of the complainant, although the weir and the greater part of the race, if constructed, will be on the said land of the complainant; that they threaten, without the consent and against the will of the complainant, to construct this waste weir and race for the purpose aforesaid; that they have no right or authority to do so. The act referred to by the bill is made a part of it. • The bill prays an injunction, which was allowed in vacation. The defendants de *127 murred to the bill, and moved to dissolve the injunction and dismiss the bill.
This act, which is a part of the bill, 29 Local Acts, 199, provides, that on the owners of Neville’s mill releasing to the state all damages sustained by them, by the construction of the canal and supplying it with water from the Scioto river, that then the canal commissioners should construct in this feeder a waste weir oí sufficient dimensions to pass off all the surplus water of the river, which can safely be made to pass into said feeder, over and above what can be safely made to pass along said canal below its junction with said feeder; and shall cause to be constructed a sufficient race from such waste weir to the point where the canal leaves the head race leading to the mill known by the name of Neville’s mill, and shall permit all the surplus water as aforesaid to pass through said waste weir into said race for the use oí said mill. This act further provides, that if the Supreme Court should determine that owners of mills on the Scioto river, who were injured by turning water from the river into the canal, could not recover damages for such injury, because the Scioto was a navigable stream, that then the canal commissioners should appoint appraisers, to ascertain the value of the water privilege, on which value, the owners of the mill ■should pay to the canal fund commissioners annually six per cent.; and if they failed to pay, that the privilege should be forfeited. That if the Supreme Court should determine that the owners of mills on the Scioto *river were entitled to damages for such injury, and that the state had no right to pass into the canal more water than was necessary for the purposes of navigation on the canal, that then the value of this water privilege, and the injury which the owners of this mill would have sustained without it, by withdrawing from the river, into the canal, more water than was necessary for navigation, should be ascertained by appraisers appointed by the canal commissioners; and if the value of the water privilege was equal to the damages, that the owners of the mill should receive the difference from the canal fund. By the last section of this act it is provided, “ that nothing in this act contained, shall be construed to affect, or interfere with the rights of any person or persons, through whose land said race may be constructed.”
A demurrer admits the facts stated in the bill. Me Arthur, then, must be considered as owning the land, against which the dam of the feeder is abutted, through which the feeder passes, where the *128 waste weir is intended to be erected, and through which a greater-part of the race, if dug, will pass. Through this race, this mill is probably forever to be supplied with water — this, without any right or authority derived from McArthur, or from any source other than the act of the legislature of March 8, 1831, which declares that' nothing in it shall be so construed as to affect or interfere with the-rights of any. The entering on McArthur’s land and digging this race, the subjecting it, forever, to the passage of this water, forever'to be entered on as often and as far as may be necessary to cleanse and keep the race in repair, without the consent of McArthur, must undoubtedly affect and interfere with his rights. After this is done, will McArthur have that full and exclusive enjoyment of his landhe before had? Can the Nevilles and Cushing acquire-a right to pass water over the land of McArthur, without McArthur’s right being thereby lessened or impaired? Their right to pass this water may, if acquired, be worth half their mill; must not Arthur be affected ?
There being no provision in this act of the legislature, of March 8, 1831, for ascertaining the value of any land through which this race might pass, contrary to the will of *the owner, and for its payment, makes it highly probable that the legislature did not intend that it should interfere with the rights of any without their consent.
We can not presume that the legislature would be unmindful of the constitution, which declares that “private property ought and shall ever be held inviolate, but always subservient to the public welfare, provided a compensation in money bo made to the-owner,” art. 8, sec. 4; of the constitution of the United States, which declares that property shall not be taken “for public use-without just compensation (amendment 5); of that fundamental principle of which our constitutions are only declarative, that when the government tabes private property for public use, full compensation shall be made to the owner. The laws of nations require it. 1 Vat., sec. 244. To establish justice is the declared end of our government. Preamble to constitution of Ohio and United States. Before the owner can, without his consent, be deprived of his land for the public use, the legislature must declare by law that the public welfare requires it (1 B. C. 139), direct the- mode of ascertaining its value, and prpvide for its payment. The mouth of the owner is closed, he can make no terms, the gov *129 ernment will take it, and must have the value ascertained, and. pay for it.
In the case of Gardner v. The Trustees of the Village of Newburgh and others, 2 Johns. Ch. 162, which was this: H. owned a farm near the village, on which was a spring, the water from which flowed in its natural channel from the farm of H. across, the farm of Gardner, and supplied his farm, brick-yard, and distillery with water. An act was passed by the legislature of New York to authorize the trustees ot the village to convey the water from the spring into the village for the use of the inhabitants. The act provided for the indemnity of H., the owner oí the spring,, and of another person through, whose land the water had to be-conveyed in passing to the village, but made no provision for the indemnity of Gardner. Chancellor Kent said that he “supposed the necessity of a provision for the compensation of Gardner did not occur to the legislature, or it doubtless would have been inserted ; until, then, some provision be made for affording him compensation, it would be unjust *and contrary to the first principles oí government, and equally contrary to the statute, to take from him his undoubted and prescriptive right to the use and the enjoyment of the stream of water and he, to prevent it, granted an injunction.
The legislature, on March 7, 1831, the day before they passed this act, passed the act “ defining the duties of supervisors of roads and highwaysby section 9 of that act they expressly authorize the supervisors to enter on lands near the road for materials to repair or construct the road, and, by section 10, point out the mode in which the value of any timber or stone taken and used for their purposes should be ascertained, and paid for. Seven days after, on the 14th of March, they passed the act for the opening, etc., of state roads; by section 17 they provide for ascertaining the injury which may have been done to any person by opening and making the roads, and for its payment. On the same day the “ act for opening and regulating roads and highways ” was passed; this provides for ascertaining the damages done to any one whose land should be taken for a road, and for their payment.
The legislature had these road laws under consideration when they were considering the act of the 8th of Masqh. By providing in the road laws for the taking of property of individuáis without their consent, and for the assessing its value and p>aying for it, while *130 in the other they declared that it should not be interfered with, and no provision is made for its valuation and payment, is shown, •beyond a doubt, the intention of the legislature that it should not be taken.
It is contonded that, to pay the owners of this mill the damages they have sustained by constructing the canal and supplying it with water from the river, the canal commissioners have a right to construct this race, and pass the water through it from the feeder, by virtue of the constitution and of laws before enacted by ■the legislature.
All the authority which the commissioners have to enter on, or •take from the owner, without his consent, any land or interest in land, or materials for any work whatever, is given them by the ■“ act to provide for the internal improvement of the State of Ohio by navigable canals,” passed *February 4, 1825, vol, xxiii. 50. By this act they are directed to enter on and take possession of the land, water, and materials necessary for the construction and making the canals navigable, and for no other purpose. The legislature, in 1820, “ for the effecting a navigable communi•cation ” between the Ohio river and Lake Erie, appointed commissioners to locate a canal, and applied to Congress for aid in its construction. Vol. xviii. 147. In 1822 an act was passed, authorizing the governor to employ an approved engineer, to ascertain “the practicability of uniting the Ohio and Lake Erie” by “a navigable canal,” and creating a board of seven commissioners, who were required to make estimates of the cost of making the canal or canals.
The legislature having ascertained that it was practicable to connect these waters by a navigable canal or canals, passed the act of February 4, 1825, to effect that pui’pose; and having by section 1 of this act, organized the board of canal commissioners, provided for their payment, etc., and giving them authority to employ such engineers and assistants as should be necessary to fulfill the duties imposed on them by that act, by section 2 enact, “ that the said canal commissioners are hereby authorized and empowered in behalf of this state, and on the credit of the fund hereby pledged, to commence and prosecute the making of a navigable canal on the Muskingum and Scioto route so called, from the Ohio river at or near the mouth of Scioto river,” etc., “ to Lake Erie,” •etc., “ and likewise a navigable canal on so much of the Maumee *131 .and Miami line, as lies between Cincinnati and Mad river, at or near Dayton.” Immediately after this formal grant of power to «construct the two “ navigable canals,” by section 3 it is enacted, “ that for the purpose of carrying into effect the object hereby contemplated, there shall be constituted a fund, to be denominated the canal fund, which shall consist,” etc. By section 8 it is ■enacted, “that it shall and may be lawful for the said canal commissioners, and each of them by themselves, and by any and ■every superintendent, agent, and engineer employed by them, to enter upon, take possession of, and use, any lands, waters, streams, .and materials, necessary for the prosecution of the improvements intended by *this act, and to make all such canals, feeders, dykes, locks, dams, and other works and devices, as they may think proper for making said improvements; doing, nevertheless, no unnecessary damage.” It is further provided by this section, that on application to the canal commissioners, by the owner of any land, water, or materials taken and appropriated for the purposes above mentioned, they should appoint not less than three nor more than five discreet persons, who, on oath, should appraise -or estimate the loss sustained by the applicant; and that the canal commissioners should pay to the owner the damages assessed.
It was impossible for the state to have these canals constructed and made navigable without acquiring a water power, which might be rented or sold for hydraulic purposes for considerable sums, without affecting the navigation on the canals, or the rights «of any.
The legislature, to enable the fund commissioners to raise funds for the construction of the canals, to enable the canal commis■sioners to contract for their construction, and to pay those whose land, or water, or stone was taken for their construction; and to insure the payment of the debt of the state, to be contracted by the fund commissioners, pledged for its redemption, by sections 5 •and 6 of this act, a certain proportion of the prdiiaary revenue of the state, and all the net proceeds of tolls collected on the canals, .and of the rents and profits of all privileges and works connected with the canals, which belonged to the state. The fund commissioners, by section 7 of this act, are required to pay to the canal commissioners such money as may be “ necessary for, and applicable to the objects contemplated ” by the act, which money the *132 canal commissioners are required to expend “in all such works a® may be proper to make the said canals.”
From the formal grant of authority to the canal commissioners, by section 2, to construct the navigable canals, from their being directed to expend the money of the state in making the canal, and from the whole act, it appears evident that the legislature intended to authorize them to go no further. The disposable water power is noticed only to lien it to the fund commissioners. The canal ^commissioners are not authorized to seize lands for mills or materials for their construction ; they are not authorized to dispose of the water power for hydraulic purposes. When a part of the canal is navigable, they are required by this act to-establish reasonable tolls, and provide for their collection, section 7, but they are not authorized to fix a price or rent on the disposable-water power.
The canal commissioners are authorized by section 8 to pay those from whom they take land or water, or materials in constructing the canals, the value of the property taken. This, by the constitution, must be in money.
The legislature, neither by this nor any other act, have placed anything but money in the hands of the commissioners to pay any demand. How, then, can the commissioners, independent of the act, which is a part of this bill, convey this water to Neville’smill, to pay them the damages sustained by the construction of the canal.
If there was room for a doubt on this subject, it is removed by after legislation. Bythe act of February 7,1826, “to provide for the increase of the canal fund, by the purchase and sale of real estate,” in vol. xxiv. 58, the canal commissioners are authorized “to procure, by purchase or otherwise,” a suitable number of acres of land, at every point adjoining the canals, where the surplus water can profitably be used for hydraulic purposes, provided no-contract, made by the commissioners to purchase, should be binding on the state until approved by the governor. The commissioners are further authorized by this act to sell any lands which had been or might be given to the state for the benefit of the canal-, fund, and which were not adjoining the canal at points where the-surplus water of the canal could be profitably used for hydraulic purposes. They are also directed to take all deeds, whether of gift or sale, for the benefit of the canal fund, to the state. If the *133 -canal commissioners had been before authorized to seize on lands, •without the consent of the owners, at the points on the canals where the surplus water could advantageously be used for the benefit of the canal fund, and had the legislature intended they ¡should exercise that power, they would not have passed this law, with the provision that no contract to- purchase ^should be binding until approved by the governor, without providing that no seizure of the commissioners, against the will of the owner, should be valid without his approbation. “ By purchase or otherwise,” certainly means by gift. There is no provision made for valuation or payment. By section 3 of the “ act in addition to the several acts for the protection of the Ohio canals, and for other purposes,” passed on February 28, 1830, vol. xxix. 380, the canal commissioners are authorized to order any surplus water, which can be spared from the feeders or from the canals, without impairing the navigation, for hydraulic purposes, to be sold with-any land given to, or purchased by the state, on which to use such water. No mention is here made oí any land which the state had seized for this purpose. By section 5 of “ the act for the protection of the Ohio canal,” passed February 11, 1828, it is enacted “ that whenever, in the opinion of the board of canal commission•ers, any water may be spared from any state canal, or works connected therewith, without injury to the navigation or safety'of such canal, the board may order a sale of such surplus water, for n. term of years, in their discretion, to the person who shall.bid the highest annual rent therefor, provided that the same ” shall not in any way interfere with the rights of individuals. By the last section of this act, the legislature expressly repeal all laws inconsistent with its provisions. This act expressly authorizing the canal commissioners to sell the water power of the state which can be spared from the canal, without affecting the navigation, requires them to sell at auction to the highest bidder, and prohibits them from interfering with the rights of any in disposing oí that water. The act of February 28, 1830, extended the authority of •the commissioners to the sale of the land sold or given to the •state, to use on it the surplus water for hydraulic purposes; and to the sale of her surplus water power on her feeders and at her works, for improving the navigation of rivers, and required them, in all their conveyances of water power, to insert a condition that whenever the water was deemed necessary for navigation it *134 should be withdrawn, and the purchaser should either receive-back the purchase or have his rents remitted, as ^should, be just. By this act it is provided that all moneys arising from, any contract made in pursuance of it, shall be paid into the state' treasury, and form a part of the canal fund.
There is nothing in this act inconsistent with the provision of the act of February 11, 1828, that in no sale of water power by the commissioners should the rights of any be affected. The-legislature, therefore, thought it not necessary to repeal it. They carefully provided for the rights of those who purchased, when the state should withdraw the water. There is nothing in this,, or any other act, from which an inference can be drawn that the legislature intended that the commissioners should seize on the property of any, to sell or rent it, to pay the proceeds into the state treasury, or any department of it. On February 22, 1830r the legislature passed an act to authorize the canal commissioners-to occupy and use part of the common of the town of Newark, in the employment of the water power of the canal, provided the town council consented. This was but six days before the passage of the act last mentioned. Here they prohibited the use of a town common for this purpose, without the consent of the town council.
Roads, streets, landing places on navigable waters, canals, and fortifications are necessary. For these and some other public uses, the public must have land. To enable them to command so much of it as is necessary to be used and occupied for public purposes, is almost the only reason for subjecting the land of the owner to be taken by the government. A nation might be reduced to so great a strait as to go farther. Spain had to cede Gibraltar for a garrison to her enemy, whether any part of it belonged to a private owner or not. The public must have materials, such as-stone, timber, and gravel, to construct and repair her roads and. canals. The very existence of the soldier, in time of war, may depend on the food, etc., to be taken from the inhabitants in his neighborhood; for these reasons, property, other than land, is-subject to be taken by government. When taken, it is to be used by the government — the food for the hungry soldier, the stone- and timber in making and repairing the public work. 2 Johns; Ch. 166. When the state takes land *from the owner, as the constitution of the United States expresses it, for “public use,”' *135 she takes no more, nor any greater interest’in it than is necessary for the “ public use.” He who owns the land over which a road passes, still retains the fee subject to the public use. A tree left by the public is his — -a quarry underneath is his; he may take the tree or work the quarry, if he does not thereby impair the road. When the road is discontinued, the whole interest of the land is again in him. Our governments have always acted on these principles. I know not that there was an instance of any state, distressed as they were, during the revolution, ordering the property of any individual to be taken and exchanged for arms- or clothing, or food, for the unarmed, unclothed, and hungry soldier. Our legislature has never directed either the land or personal estate of any man to be taken and transferred to another, to pay him the damages he had sustained by a road being laid on his land. They have ever considered it as a debt to be paid in money. They have never directed him to go and take his neighbor’s land, or timber, or stone, in compensation for what he had lost. They have never directed property of any kind to be taken from the owner, unless it, in kind, was wanted for public use. Considerable excitement sometimes existed, respecting the canals, but the legislature still kept this principle in view. To make the navigable canals, they directed the land to be occupied, and the materials to be used in their construction to be taken. For the-using or selling their water power, for hydraulic purposes, they prohibited it.
Nations, to discharge their debts, levy taxes; for roads and other-public purposes, requiring the occupation of land, they take land-No other course is just or consistent with the security of property, or the public welfare. Our state has pursued this course as-the only constitutional one. She has not, either to relieve or increase the canal fund, or any other department of her treasury,, directed the property of any one to be affected without his consent.
It is contended that the canal commissioners, having a right to construct waste weirs in the canals and feeders to pass off surplus water wherever they think it necessary; have a right to dig a race or ditch to convey from the weir the water which ^passes through it; that this lessens the injury to the owners of the land over which it passes; that, consequently, they have a right to erect this weir, and dig this race. The commissioners undoubtedly *136 have a right, and it is their duty, if they have the means, to construct waste weirs wherever it is necessary to preserve the canal’s or feeders, or to facilitate navigation on the canals; and to cut ditches from the weir where the water would otherwise overflow, and injure the adjoining lands, as it is the duty of a supervisor of a road to cut ditches to pass off water which would otherwise injure the road; but a supervisor who should cause the water to be conducted into the road, that he might enter on the land below, against the will of the owner, and cut a ditch to pass it off, would be a malicious trespasser, without excuse, who should pay most exemplary damages. Here, the water which is to be passed through this weir and race, is to be turned into the feeder for the express purpose, and no other, of being passed through this race and weir to supply Neville’s mill. The feeder is to be overcharged with water, to make this weir and race necessary to the preservation of the canal; more water is to be passed along the feeder to the weir than “ can safely be passed along the canals” below the feeder. It is very clear that on this ground the defendants can not be justified.
On sales of water power or land the commissioners are required by the general laws to have the proceeds paid into the state treasury for the canal fund, which is a department of the treasury. The proceeds of the water power are liened for the discharge of the canal debt by the act of 1825. They are not authorized to dispose of it to persons who have been injured by the canal, to pay them for their unliquidated damages. The legislature have, in this case, made the contract; this act is nothing more than a ■contract between the state and the Novillos and Cushing, by which, the state agrees with them, that on their releasing to her all damages which they have sustained by the construction ot the canal, etc., she will dig this race and construct the waste weir, and forward through the feeder and weir into the race the water for tho mill, if it can be done without affecting or interfering with the rights of any. If there are rights which will *be affected by this race, the getting them in by the Nevilles and Cushing is .a condition precedent to calling on the state to construct the weir and race. The canal commissioners, as agents of the state, are required, in executing the contract, to interfere with the rights of none. Now, to subject the state to the payment for any right which maybe affected is contrary to this act or .contract, and *137 -unjust. The state agreed to be at the cost of digging the race, •constructing the weir, keeping up the dam, and forwarding the water through the weir only, and not to that of getting any right necessary to convey the water to the mill, or to be subjected to any damage for doing so, but provided that she would not. Every light in which we can view this subject manifests that the •commissioners had no right to construct this race without the consent of McArthur.
It is contended that the injury to McArthur will be trivial; that it will not be grievous; that, therefore, this court will not interfere by injunction. The bill might have stated the length of the .race, or of that part of it which passes through McArthur’s land. It states that the dam is abutted on McArthur’s land; that the -weir and the greater part of the race will, if constructed, be on McArthur’s land; that the race is intended ever to be occupied for the use Of the mill. If this land of McArthur, between the feedor and the river, was of little value before the construction of the dam and feeder, after this construction it becomes of considerable value. It is valuable in proportion to the value of the water power, and to the' necessity to use this water power on or through this land. The water power is of as little value to the owner, without land to use it on, as the land can be without the water power; and it would consequently be as unjust, and an injury .as grievous, to force the owner to part with his land as to force the owner of the water power-to part with it. Suppose at this weir McArthur owns one hundred feet, through which this water must pass; the Nevilles and Cushing own the land between that .and the river, fifty or one thousand feet; they, having purchased the water power of the state, can they use McArthur’s land without his consent to convey the water to theirs, and then say to McArthur, we owning the water power aryl the land below, your land is of *no value to you; your injury is nothing; to us, though, your land is of immense value — without it our water privilege is worthless? If the court by injunction prevent.persons from cutting timber, to the injury of the land upon which it is ’growing; tenants from pulling down houses, from draining fishponds, or from cutting down ornamental trees, or from plowing meadow where the lease forbids the plowing (1 Mad. Ch. 143-149), how can it refuse an injunction in this case, where the land of McArthur is to be taken from him forever, so far as is necessary *138 to keep up the race and pass this water? 1 Fonb. Eq. 29; 2 Johns. Ch. 162.
The case of Jerome v. Ross, 7 Johns. Ch. 315, in which the chancellor refused an injunction, differed materially from this; that was a simple trespass of almost the least injurious kind, the taking stone to erect a dam from a cliff of rocks, in which, and in the neighboring cliffs, the quantity was such as to make them of little value; and their removal did not diminish the value of the cliff. It was like taking a winter’s fire-wood for a family from the fallen beech and sugar-tree and tops of fallen and decaying oaks of a thousand acre tract of unimproved woodland. In this case a permanent appropriation of the land of McArthur is intended. The legislature, in the contract with the Nevilles and Cushing for this water power, have carefully guarded the rights of McArthur, as we have seen; they are now endeavoring, at the expense of the state, by color of this contract to prostrate these rights. It is very clear that this objection can not prevail with this court:
It is contended that the bill should have stated that the release to the state had been executed, and that the canal commissioners had commenced the weir or race, or that preparations were made for its commencement; that the statement that they “ threatened” to construct the weir and race is not sufficient to authorize the injunction. An injunction prohibits the doing something which, would injure or endanger the rights of the complainant, as the causing nuisances, or committing trespass of certain kinds, or the assignment of a note, or the payment of money. If the court had evidence that the defendant intended to commit the wrong, before-its commencement, and that he had power *to do it, they could no more refuse the writ to prevent its commencement than after its commencement to stop its progress. Why should the court? There are many cases in which, if the court could not issue the writ until the wrong was commenced, it would be of no avail, as to prevent the assignment of a note, opening of a mill-dam, or taking down a house. And in this case the canal commissioners, with the force in their employ, might not allow sufficient time after the commencement of the work until it was finished to have ».n injunction applied for, allowed, and served before its completion. The bill states that the defendants “ threaten ”■ to dig this race, which is confessed by the demurrer. On proof of the defendants threatening to do the wrong when it appears that *139 they have the power, the court issue this writ. 1 Mad. 138, 147-149; 2 Mad. 216; 2 Har. 131.
It was'not necessary to state in the bill that the release to the-state was made. It is made the duty of the defendants to have it executed; its execution may lie presumed from their threat. Whether the release is executed or not, the injury would be the same to McArthur, and the defendants are equally unauthorized, to inflict it. Upon the whole, the court are clearly of opinion that the motion to dissolve the injunction must be overruled. The defendants had leave to answer.