## ADJUDGED IN

# THE COURT OF CHANCERY

### OF THE

## STATE OF NEW JERSEY.

### OCTOBER TERM, 1866.

---

### COSTER *vs.* THE TIDE WATER COMPANY.

1. The legislature has no power, by special act, to transfer to one man the property of another, without his consent, either with or without compensation. This want of power does not depend upon any constitutional restriction, but upon the fact that it is not the exercise of. the power of making laws, or rules of civil conduct, which is the branch of sovereign power committed to the legislature.

2. A grant of power to one man to improve the property of another, without his consent, at an annual compensation to be fixed by commissioners to be appointed for that purpose, not limited to the cost of the improvement, or the interest on the cost, or the benefit received by the property, but to be fixed by the arbitrary discretion of the commissioners, is a grant to one of profit out of the land of another, to the extent that such compensation may exceed the cost, or interest on the cost. It therefore, is beyond the power of the legislature, and void.

3. The grant to one of the power to manage and improve the property of another, without his consent, and contrary to his judgment, even if exclusively for his benefit, is an infringement of the right of acquiring, possessing, and enjoying property, guaranteed to every one by the constitution.

4. The power of eminent domain is a legislative power; these powers, by the constitution, are vested in the legislature. Private property may be taken for public use, but only on adequate compensation.

54

5. The public use for which property may be taken by the power of eminent domain, is the use of the property itself by the government, or by the general public, or some portion of it; not by particular individuals, or for the benefit of certain estates.

6. Whether the use for which property is taken is a public use, is a question of law, to be settled by the judicial power. Where the use is a public use, the legislature are the sole judges of the necessity or expediency of exercising the power of eminent domain in the particular case. But it cannot evade the constitutional limitation of its power, or make a private use a public one, simply by enacting that it is such.

7. The laws regulating partition fences, party walls, the enclosure of woodlands, the ditching and embanking of meadows, and other like police regulations, whether general or special laws, are an ancient branch of legislation. Their object is to regulate the management and enjoyment of property by the owners, or a majority of them, at their common expense, and they are a proper and constitutional exercise of legislative power.

---

The complainant filed his bill in this cause to restrain Atterbury, Merrill, and McIntosh, the commissioners appointed under the charter of The Tide Water Company, the other defendant, from making a contract with that company, to dyke and drain the lands of the complainants and others, against their will. A temporary injunction was granted. No answer was filed, and no depositions were taken. The cause is heard upon a motion to dissolve the injunction.

*Mr. Williamson*, in support of the motion.

*Mr. McCarter* and *Mr. Vanatta*, contra.

THE CHANCELLOR.

The complainant, as devisee of John G. Coster, claims an undivided interest in fee, in thirty-nine hundred acres of marsh or meadow land, bounded in part by the Passaic river, Newark bay, the Hackensack river, and Saw-mill creek, a tide water tributary of the Hackensack, and in part, on the west side, by lands of Francis S. Lathrop and others.

Peter C. Schenck, and nine others of the defendants, by an act, claimed by them to be passed on the fourth day of

April, 1866, according to the constitution, were incorporated by the name of " The Tide Water Company." The preamble to this act recites that " the tide water marshes adjoining Newark bay, and its tributary streams, cannot profitably be drained by individual owners thereof; that the revenues of the state would be largely increased from the taxes on said marshes, when properly fitted for occupancy and use; that the maintenance of such drainage will be a public work, requiring continuous and constant care to protect the interests of the large number of persons who may use and occupy said lands, and who, by such use and occupancy, would add considerably to the wealth and population of the state; that the frequent overflowing of said marshes materially interferes with the construction, maintenance, and use of suitable highways of travel thereon, for the accommodation of the people; and that said marshes, in their present condition, are detrimental to the public welfare of the populous communities in their vicinity.

The sixth section of the act provides, that the company may reclaim and drain the wet or overflowed lands in and about the tide water marshes of Newark bay, and of the streams flowing into said bay, except those within the counties of Bergen and Essex, and receive an annual compensation therefor, as thereinafter provided, and may construct and maintain all works necessary or convenient thereunto.

The eighth section enacts, that any justice of the Supreme Court may appoint three commissioners of said lands, and fix their compensation, their term of office to be for nine years; thirty days notice of the application to be given in two newspapers in each county.

The ninth section provides, that said commissioners may contract with said company for the construction, maintenance, and management of suitable dykes, drains, ditches, dams, sluices, engines, pumps, and all other machinery, works, and structures, necessary or useful in the improvements required to fit said lands for occupancy and use, and for the maintenance of the drainage therefrom, and may contract for the

Coster v. The Tide Water Company.

drainage thereof, and shall pay said company such annual compensation therefor as said contract shall specify; and they shall report said contract to any justice of the Supreme Court for confirmation, and it shall not take effect until confirmed.

The tenth section enacts, that said commissioners, after the reclaiming of said lands, or any part thereof, shall have been completed according to said contract, shall assess, upon the lands so reclaimed, a just proportion of the contract price, and of the expenses of said commission, and shall cause the same to be collected annually, and pay the stipulated compensation to said company; provided, if said company fail to keep any portion of said lands drained so as to be fit for occupancy and use, no tax shall be collected on such portion of said lands in the year or years when such failure shall happen.

The act provides for a collection of unpaid assessments by sale of the lands, which the company are allowed to purchase. It provides for locating the works of the company, and for obtaining the lands required for them by condemnation, declaring that, by payment of the sum awarded, the company shall become seized in fee.

The fourteenth section requires the company, in one year after the completion of the work, to declare a dividend to the stockholders of the net proceeds thereof, and to declare like dividends semi-annually thereafter. The capital authorized is one million of dollars, with power to borrow, on bond and mortgage, a like amount. No capital is required to be paid in. The corporators are made the directors; and they continue such, until new ones shall be chosen in their places.

On the second day of June, 1866, Chief Justice Beasley, on application of the company, appointed Edward J. C. Atterbury, Henry W. Merrill, and Charles McIntosh, three of the defendants, commissioners of said lands, under the eighth section of said act.

Of this appointment no notice was given to the complain-

ant, or the other land owners, except by advertisements, as provided in said act. The complainant, or his agents, did not know of it, and of course did not appear.

The commissioners gave public notice that they would meet at Jersey City, on the 17th of August, 1866, to consider and decide upon a contract with the company, and that the land owners might appear and would be heard. At this meeting, the complainant and other land owners appeared; a draft of the contract, proposed to be entered into by said commissioners with the company, was exhibited, also a map of the lands proposed to be drained, and showing the works by which the company proposed to accomplish the draining; and these included the lands of the complainant. The contract described particularly the location and dimensions of all the dykes, ditches, drains, and other works, proposed to be erected.

The amount of the compensation was in blank in the draft, which provided for the payment "in each year for all lands drained by said company, as provided in the aforesaid act, at the rate of ——— dollars per acre, per annum; and for lands which now are, or may hereafter be built upon, the additional sum of ——— dollars per annum, for each building occupying at least one hundred, and not exceeding one thousand square feet of land; and for each additional one thousand square feet of land, or fraction thereof occupied by any such building, the sum of ——— dollars per annum."

The commissioners, at the request of some land owners, postponed making the contract until the twenty-seventh of August, refusing to grant longer time to the applicants, on the ground that it was too late in the season; the commissioners had no knowledge of the cost and expense of constructing and maintaining such works, and had no funds to expend in discharging their duty.

None of the corporators own any land in the tracts proposed to be drained; none of the land owners applied for the act, or advocated it, but many of them who knew of it, opposed it strenuously. The bill was not signed by the Gov-

ernor, but was returned by him to the senate, where it originated, with his objections thereto. On being re-considered by the senate, in due course, it was lost. On a subsequent day in the session, the vote by which it was lost was re-considered, and it received a majority of the votes of the senate, and being transmitted to the house of assembly, it was there re-considered and passed.

These are the facts as stated in the bill. On presenting this bill, duly verified, a preliminary injunction was granted, restraining the commissioners from making any contract.

The cause is now before the court on a motion to dissolve the injunction; no answer has been filed, or depositions taken. Therefore, the facts stated in the bill must, for the purposes of this motion, be taken as true.

The complainant places his right to relief on two grounds. First, that the giving over of these lands, to be drained and managed, to a company of private adventurers, who are to receive an annual sum, to be fixed by three commissioners appointed on their application, at the discretion of the commissioners, without being restricted to the cost of the improvement, or the benefit to the land owners, which sum is to be fixed as a rent charge on these lands forever, is a usurpation of power not granted to the legislature, and in contravention of constitutional restrictions.

Secondly, that the pretended statute under which the commissioners were appointed and claim to act, never became a law according to the requisites of the constitution of New Jersey; on the ground that the senate, having rejected the bill after it was returned to them by the Governor, had lost all further power over it, and it could only be brought up by being introduced anew, and going through the usual forms of legislation.

The provisions of this act are certainly extraordinary, and, so far as my observation goes, entirely unprecedented. But, if within the power of the legislature to enact, this can have no effect on their validity. The territory included within the purview of the act, and the dykes and ditches in the

proposed contract, set out by complainant, is extensive; it covers about one-fourth of the county of Hudson, and several thousand acres in the county of Union. The tracts lie miles apart; their drainage is not connected. These lands belong to numerous owners, who are occupying and using them, some of whom may, at this time, be selling them or improving them in ignorance of this law, supposing that their title is unaffected by any encumbrance, rent-charge, or other right of strangers. This act proposes to give to ten strangers, who own no part among them, and against their will, an annual rent-charge or encumbrance forever upon their lands, the amount to be fixed by three commissioners appointed on application of the company. There are no qualifications re-quired for the commissioners; they need not be freeholders, or residents of the county or state; they are not required to have any experience, skill, or knowledge of the matter of draining lands, or of the construction of works for that purpose, or of the cost of erecting, maintaining, or operating them; they are not required to be sworn; they are not required to be impartial. If one of the corporators should be appointed, a well established principle of administering justice would, no doubt, make that appointment void; but if a son or brother of one of the corporators was appointed commissioner, or one attached by many other relations, which create a bias as strong and more dangerous, because less apparent, there would be no redress. Doubtless no · judge would, knowingly, appoint such commissioner, but if appointed, it would not be contrary to the act, and there would be no relief.

These commissioners, so appointed, are to make the contract with the company. They are first to determine what works are to be constructed and maintained, and next, they are to fix an annual compensation therefor, to be specified in the contract. This annual sum they have power to fix, and no rule or limit is laid down in the act, by which it is to be fixed. It must be an annual sum; it cannot, therefore, be the expenses of the improvements, nor need it be limited to the

interest on the outlay, and the expenses of maintaining, repairing, and operating the works.    The work was to be at the risk of the company; if, in any year, they fail to drain any part of the lands, such lands, for that year, are exempt from pay.    Partial failures may be probable; they must be provided for; and the Tide Water Company, composed of strangers, without doubt, expect profits.    The act provides for half yearly dividends.    The whole scheme is got up, on the face of it, for the profit of the corporators; not only the absence of words restricting the compensation to the amount of costs and expenses, but the whole character of the act, as well as the draft of the contract to carry it out, shows that it was intended for the benefit and profit of the corporators, and not for the good of the public, or land owners.    It would not be reasonable to expect them to undertake the work without a probable profit secured.    The title to this act which, by the constitution, must express its object, is to incorporate the company, not to drain the salt marsh.

The commissioners, then, are not only at liberty to fix the annual compensation of the company above the amount of expenses incurred by them as profits, but the whole scope of the act would fairly indicate to them that such was their duty under it.    It would be impossible for the most skillful engineer, or the most experienced contractor, to fix, by estimate, the cost of the original works to be erected in the course of the next year, with the uncertain and varying relation of prices and labor; and it is impossible to approximate to an annual sum that would just repay to the company the interest on the cost and the expenses of maintaining, repairing, and operating these works, and of managing and superintending them.    Impartial commissioners would find it difficult to come near such a result, even if they were specially directed and sworn to aim at it.    But the act permits them to exceed this, and commissioners who thought that the object of the act was what it indicates on its face, to give the corporators a profit out of the improvement and management of these lands, would give them such profits as their liberality or kindness might dictate.

Whatever the value of this profit, beyond the actual cost, might be, is a charge gratuitously made by the legislature upon the property of the land owners. It is so much taken from the pocket of Coster and given to Schenck. It is so much of the property of one man given to another. I think there can be no mistake that this is the effect, as well as the object of this act. The proposed contract shows that the commissioners and corporators so understand it. The plan is to fix upon each acre of this large territory a permanent ground-rent, and to increase it as every house, shop, stable, or out-house, of ten feet square, is built; a matter that can have no reference to cost. These rent-charges, held by one in the property of another, are one of the most odious remnants of the old feudal lordships, and in New York the popular feeling against them has rendered it almost impossible to execute the laws in their favor.

The question, then, to be met is, whether the legislature can grant to Schenck a gratuitous rent-charge on Coster's land. The amount is of no consequence to this discussion. The commissioners may fix it at one dollar an acre above cost, in which case the grant is of thirty-nine hundred dollars a year; if they fix it at ten dollars, the grant is of thirty-nine thousand a year. If the legislature have the power to grant this gratuity, in connection with a bill for improvement, they have the same power to grant it without such improvements. If this can be done, there is much property in the state that will stand considerable charges of the same kind, which a willing legislature may make to their favorites, either nakedly, without any pretence of service, or joined, as in this case, with building, painting, fencing, ditching, or any one of the thousand ways in which one man would be willing to control and manage the property of another for a profit over the cost of the improvements and of superintendence.

It is now settled, beyond question, that, under a constitution like that of this state, the legislature cannot grant the property of one man to another, either with or without compensation. The only power it has is that called the power of

eminent domain, vested, by necessity, in the sovereign legislative power of all governments. This is the power of taking private property for public use, whenever the necessities of the government require it. This power the constitution of this state, like that of the United States and most of the states, requires shall only be exercised upon making just compensation. The condition of compensation has generally been held annexed to the right of taking private property for public use under the most arbitrary governments, in which the powers of the sovereign are not trammeled by any positive constitutional restrictions. *Sinnickson* v. *Johnson*, 2 *Harr.* 129.

There is no prohibition in the constitution of this state, or in any of the state constitutions, that I know of, against taking private property for private use. But the power is no where granted to the legislature. The constitution vests in the senate and general assembly the legislative, or law making power. They can make laws, the rules prescribed to govern our civil conduct. They are not sovereign in all things; the executive and judicial power is not vested in them. Taking the property of one man and giving it to another, is not making a law or rule of action; it is not legislation, it is simply robbery. This power was not necessary or useful to be given to the legislature for any of the purposes for which the government was instituted; and it was not given. It is the principle of all free governments, that no right of the citizen should be surrendered to the sovereign, that is not necesssary for the purposes of government. This maxim pervades all republican governments as well as monarchies; for the tyranny of a majority, or of corrupt representatives, is just as oppressive, and far more odious, than that of a monarch. This is the aim of all our constitutional restrictions. The first declaration in the bill of rights, that forms the first article of our state constitution, affirms, that one of the unalienable rights of every man is that of acquiring, possessing, and protecting property; and the last declaration therein says that such enumeration of rights shall not be construed to deny others retained by the people. This

shows that the right of private property was made sacred by the constitution, to be invaded by no one, not even the legislative power, except where such control was expressly given by that instrument. Again, the sixteenth declaration of the bill of rights, which declares that private property shall not be taken for public use without just compensation; and the ninth provision of the seventh section of the fourth article of the constitution, the article defining and restricting legislative power, which declares that individuals and private corporations shall not be authorized to take private property for public use without compensation first made to the owners; both show, by inevitable implication, that it was not intended to confer on the legislature the power of taking private property for private use at all. And on this point the authorities and decisions, of which there are not a few, are uniform, without an exception.

*Kent,* in *Vol.* 2, *p.* 339 of his Commentaries, says : " The right of eminent domain, or inherent sovereign power, gives to the legislature the control of private property for public uses, and *public uses only;* and on page 340, " but if they should take it for a purpose not of a public nature, as, if the legislature should take the property of A and give it to B, or if they should vacate a grant of property or of a franchise, under the *pretext* of some public use or service, such cases would be gross abuses of their discretion, and fraudulent attacks on private right, and the law would be clearly unconstitutional and void." The same view is taken by other authors. *Smith on Statutes,* § 136–7 ; *Sedgwick on Statutes* 514 ; *Angell on Highways,* § 86–7. And it will be found to be sustained by numerous decisions of courts and judges of the greatest weight and authority. *Wilkinson* v. *Leland,* 2 *Peters* 653 ; *West River Bridge* v. *Dix,* 6 *How.* 545 ; *Scudder* v. *Delaware Falls Co., Saxt.* 726 ; *Sinnickson* v. *Johnson,* 2 *Harr.* 129 ; *Beekman* v. *Sar. & Sch. R. R. Co.,* 3 *Paige* 73 ; *Varick* v. *Smith,* 5 *Paige* 159; *In re Albany street,* 11 *Wend.* 149; *Bloodgood* v. *Mohawk & Hud. R. R. Co.,* 18 *Wend.* 56 ; *In re John & Cherry streets,* 19 *Wend.* 676 ; *Taylor* v. *Porter,* 4 *Hill* 140 ;

*Harris* v. *Thompson,* 9 *Barb.* 361; *Embury* v. *Conner,* 3 *Comst.* 511; *Hepburn's case,* 3 *Bland* 98; *Bowman* v. *Middleton,* 1 *Bay* 252; *Pittsburgh* v. *Scott,* 1 *Barr* 309; *Cooper* v. *Williams,* 4 *Ohio* 253; *McArthur* v. *Kelly,* 5 *Ohio* 139; *Buckingham* v. *Smith,* 10 *Ohio* 288.

In the case of *Wilkinson* v. *Leland,* a statute of Rhode Island, which had no written constitution, transferred title to lands. Story, J., says that "the doctrine is utterly inconsistent with the great and fundamental principle of a republican government, and with the right of the citizens to the free enjoyment of their property." "We know of no case in which a legislative act to transfer the property of A to B, without his consent, has ever been held a constitutional exercise of legislative power in any state in the Union."

In *Saxt.* 726, Chancellor Vroom says : "It is admitted that private property shall not be taken for private use. The legislature has no right to take the property of one man and give it to another, even upon compensation being made."

In *matter of Albany street,* Savage, C. J., says : "The constitution, by authorizing the appropriation of private property to public use, impliedly declares that, for any other use, private property shall not be taken from one and applied to the private use of another. It is in violation of a natural right, and if it is not in violation of the letter of the constitution, it is of its spirit, and cannot be supported." In 4 *Hill* 144, Bronson, J., founds his reasoning upon the fact that the right to transfer private property for private purposes, is not part or parcel of the legislative power which is conferred by the constitution.

If this is a sound exposition of the powers of the legislature, and they cannot grant or take private property for private purposes, it is clear that they cannot grant an interest in, or charge upon, or rent issuing out of, such property, to private persons, for their own profit. The compensation, beyond the actual cost of making and maintaining the drainage, which the commissioners may provide for the benefit of the corporators by their contract, which, as it is

shown, the act contemplates they shall provide, and which the proposed contract is evidently designed to secure, will be a charge on this property ; and this excess is the grant of a profit not intended for public use, but for private benefit,, and is a burthen and wrong that is beyond the power of the legislature to impose or inflict. ·

This view of the case might render it unnecessary to consider whether the purpose or object to be effected by this company is a public purpose, in such sense as that property taken by them to accomplish their purpose could be said to be taken for public use. That inquiry would be necessary if the only question in the cause was the right of the company to take, upon compensation, lands needed for their works. That question is raised in the case, but the more important one is the power of the commissioners by their contract to impose, at their discretion, a charge upon these lands, without being limited to the cost of the work, or even the benefit to these lands. That is not taking the lands ; they are not to be used for a public purpose.

But as the question arises in the case, and has been brought before the court, it perhaps should be met here. Whatever may be the recitals in the preamble, it is clear from the provisions of the act, that the object and effect of it, if carried out, will be to improve these meadows, which are private property, for the benefit and use of the owners. The public cannot use the meadows, or the dykes, ditches, drains, culverts, pumps, or machinery, for any purpose ; any stranger walking upon them, pasturing his horse, or cutting grass there, would be a trespasser ; no right is granted to any of the public. When lands are taken for a railroad, canal, turnpike, ferry, or bridge, they are for public travel and use, and the public have *the right* to go upon them and use them for the object of their construction. The number of the private owners benefited do not make them the public ; the principle is the same if the number is three hundred, as if it is only three. A private road in New Jersey may be traveled by any one who has occasion to use it ; there may be only

one, or three, or there may be three hundred, who will use it, but the right of the public to use it, makes it for public use. It is different from a right of way, which is private property, and confers no right except upon the owner. And therefore it is rightly held, that land in New Jersey may be taken for a private road, upon compensation. In New York, a private road was made by statute, a private right of way only for the applicant, not to be used even by the owner of the land over which it was laid, and therefore it was held, under their former constitution, that land could not be taken for it even upon compensation. *Taylor* v. *Porter*, 4 *Hill* 140. Their constitution of 1846, provided for this specifically.

It has been contended that the legislature, as they are the judges of the expediency of exercising the right of eminent domain for public purposes, are also the sole judges of what are public purposes, and that, as they have declared in the preamble of this act, that this will be *a public work*, the courts cannot review and consider it. If this were so, the restrictions of the constitution would be of little avail; the legislature, who determined to exceed their power to gratify some favorite, only need to recite that it would be a great public benefit to have L's hotel transferred to S, and they could make the grant.

This position is thought to be supported by the language of Chancellor Walworth, in *Beekman* v. *Sar. & Sch. R. R.*, 3 *Paige* 73, and in *Varick* v. *Smith*, 5 *Paige* 160. But a careful consideration of his language will show that he only intends to say, that the legislature must determine, in each particular case, the expediency of exercising the power of eminent domain for making *public improvements*.

In Varick's case, such is his language; and in Beekman's case, while his language *may* admit of the wider construction, yet the reference to 2 *Kent* 340, above cited, which expressly says that a grant of private property under *pretext* of public use would be void, shows in what sense he intended to be understood; above all, his clear demonstration in the subsequent part of his opinion, showing that the railroad was for

the use of the public, although they could not use their own vehicles on it, and *therefore* that the land of Beekman was taken for public use in the sense of the constitution, settles what was his meaning.

But the clear and decided weight of authority is with Chancellor Kent, that the mere grant, or recital that it is for a public purpose, by the legislature, will not take from the courts the power of inquiring whether the object is a public use.

In the case cited from *Saxt.* 727, the point was expressly raised, and Chancellor Vroom, in conclusion, says: "Not doubting that the court can safely sit in judgment on this matter, it only remains to inquire whether the use to which the property is to be appropriated is a public use."

Wilde, J., in *Austin* v. *Murray*, 16 *Pick.* 126 ; Tracy, Senator, in *Bloodgood* v. *M. & H. R. R. Co.*, 18 *Wend.* 62 ; McLean, J., in the *West River Bridge case*, 6 *How.* 537 ; and Hand, J., in *Harris* v. *Thompson*, 9 *Barb.* 362, and again, in *Woodruff* v. *Fisher*, 17 *Barb.* 231, maintain that the courts must examine and decide whether the use is a public use.

The public use required, need not be the use or benefit of the whole public or state, or any large portion of it. It may be for the inhabitants of a small or restricted locality ; but the use and benefit must be in common, not to particular individuals or estates.

But there is another branch of legislative power that may be appealed to, as authorizing the taking of the lands required for the works to drain these meadows. It is the power of the government to prescribe public regulations for the better and more economical management of property of persons whose property adjoins, or which, from some other reason, can be better managed and improved by some joint operation, such as the power of regulating the building of party walls ; making and maintaining partition fences and ditches ; constructing ditches and sewers for the draining of uplands or marshes, which can more advantageously be drained by a common sewer or ditch. This is a well known legislative

power, recognized and treated of by all jurisconsults and writers upon law through the civilized world; a branch of legislative power exercised by this state before and since the Revolution, and before and since the adoption of the present constitution, and repeatedly recognized by our courts. The legislature has power to regulate these subjects, either by general law, or by particular laws for certain localities or particular and defined tracts of land. When the constitution vested the legislative power in the senate and general assembly, it conferred the power to make these public regulations as a well understood part of that legislative power.

But this is a power to be exercised for the benefit of the parties affected, not for that of strangers. If the building and maintenance of party walls was authorized and regulated, it was to be done by the adjoining lot owners, or one of them, not upon the application of some enterprising or favored mechanics for the right to build party walls between all the lots in a certain town, at a goodly profit, and this, whether the owners wanted party walls or not.

Many private acts have been passed in this state for the draining of meadows, allowing commissioners appointed by the legislature, or, as they are in this case, to lay out the ditches and drains, and to assess and collect the expense of the drainage, including the compensation of the commissioners, out of the lands drained. I have been referred to, and examined hundreds of such acts, in this state and the state of New York.

Among others, is the act to drain the Riser in Bergen county, approved March 7th, 1850, (*Pamph. Laws* 292); which act was, by Chancellor Williamson, in the suit of *Berdan* v. *The Riser Drainage Company,* held to be constitutional, and an injunction refused.

But all these acts are understood to have been passed by the legislature, upon the application of some of the owners of the land affected by them, generally a majority, and always passed only for their benefit. Whether it is necessary to the validity of such an act, that it should be passed on the

application of the owners, or some of them, I do not now mean to decide. It seems that to make a police regulation for the benefit of several adjoining owners, such, in the true sense of the phrase, it ought to be invoked or put in motion by the parties to be benefited, or some of them, and not by strangers who expect to profit by the execution of it; as a public war should be declared for the benefit of the country, and not of the hangers-on and retainers of the army engaged in it.

But there is another peculiarity in all these police laws that is of their very nature and essence; which is, that they assess on the persons or property benefited, only the expense of executing the improvement. The object of passing them, and the only reason of the existence of this power in the legislature is, that parties may be enabled, by making the improvement in common, to save useless expense, or that one person may be allowed to do something necessary to the use of his property, by using his neighbor's land in a way beneficial to both. A profit carved out for strangers is inconsistent with this.

I find no case reported, and among the number of acts examined I do not find a single one, where any burthen is imposed upon the lands drained, except the actual expense of drainage. The principle of them all is, to make an improvement common to all concerned, at the common expense of all. And to effect this object, the acts provide that the works to effect the drainage may be located on any part of the lands drained, paying the owner of the land thus occupied, compensation for the damage by such use. So far private property is taken by them; farther it is not. In none of them is the owner divested of his fee, and in most there is no corporation in which it could be vested, and for all other purposes the title of the land remained in the owner. To effect such common drainage, power was in some cases given to continue these drains through adjacent lands not drained, upon compensation. All this was an ancient and well known exercise of legislative power, and may well be considered as in-

cluded in the grant of legislative power in the constitution. Beyond this, the limit above laid down must prevail, and we must hold that private property cannot be taken for private uses, even with compensation. Whether the power to divest the owner of his fee, contained in this act, which is not necessary or even useful for the purpose of drainage, would, in an act otherwise within the scope of legislative power, be valid, need not now be discussed.

The act under consideration does not fall within the principles on which these laws regulating the use and enjoyment of property, known as *police* laws, are based. While it provides for the drainage of lands, it is not enacted at the request, or for the benefit, of the land-holders, but that the company may make a profit out of the scheme. And were not this object specially provided for, so as to appear from the whole act to be the main end in view; if the act did not limit all charges to actual expenses, but permitted more to be levied and charged, in such manner that the courts could not control the excess; I should hold it void.

An injunction would not now be granted or continued, to restrain making the contract, because the power granted to take the fee of lands, instead of the use of them so far as necessary, is excessive and invalid. That question would arise only when the company offered to take or condemn the lands. But this contract will throw a cloud upon the title of every acre of marsh within the bounds of the proposed works. If this contract is made, and is valid and constitutional, every acre will be encumbered with a ground-rent, that may be varied and increased so as to make the fee worthless, and the land unsalable. The owners are not bound to wait for years the result of an ejectment brought for lands sold for non-payment of those assessments; but if the proceedings are illegal, unconstitutional, and void, by the established doctrine of this court they are entitled to have this cloud removed from their title. And when that cloud is placed upon it by an act of the legislature, which, until declared void by the proper tribunals, is

presumed to be valid, there is the strongest reason for this court exercising its jurisdiction.

For the reasons above stated, I am of opinion that the grant of power in this act to the commissioners to make a contract with the company to bind the property of the landholders, is beyond the authority of the legislature, and void. This conclusion relieves me from considering the second question, whether this act ever became a law.

The motion to dissolve the injunction must be denied.*

---

* Decree affirmed, *post p.* 518.